# MARYLAND INSURANCE COMPANY.

*v.*

# LE ROY, BAYARD & M'EVERS.

1812.

Feb. 11th.

*Absent....Marshall, chief justice.*

The discharge of underwriters from their liability, in case of taking on board an additional cargo, not authorised by the policy, depends, not upon any supposed increase of risk, but wholly on the departure of the insured from the contract of insurance. The consequences of such a violation of the contract are immaterial

ERROR to the Circuit Court for the district of of Maryland, in an action of *covenant* brought by *Le Roy and others*, against the *Maryland Insurance Company*, upon a policy of insurance upon the *Ship John*, from New York to five ports on the coast of "Africa, be-"tween *Castle D'Elmina and Cape Lopez*, including those "ports, and at and from them, or either of them, back to "New York *with liberties as per order for insurance*."

The order of insurance was as follows, viz: "At "what rate will you insure three thousand five hundred "dollars upon freight of the ship John of New York, "valued at that sum, at and from New York to *Castle* "*D'Elmina*, on the gold coast of Africa, with liberty "for the vessel to touch at the *Cape de Verd Islands* for "the purchase of stock, such as *hogs, goats and poultry* "and taking in water?"

" *Also*, nine thousand dollars on the American ship " John, valued at this sum; and eleven thousand eight "hundred dollars on cargo by said ship consisting of " wine, rum, beef, geneva, dry goods, tobacco, mo- "lasses, &c. at and from New York to five ports on the " coast of Africa, between Castle D'Elmina and Cape " Lopez, including those ports, with liberty of touching " and trading at all, or any of said ports, backwards " and forwards, and at and from her last port on the " coast, to New York, with liberty of touching at the " *Cape de Verds* on her return passage, *for stock* and " take in water. It is understood that the captain re- "turning to one or more ports that he had touched and " traded at before, shall not be considered a deviation. " The John was ready and expected to sail the 13th " inst. There are no cantraband goods on board, and " the *ship is armed* with eight carriage guns, with am- " munition in proportion, and is an excellent vessel and " captain Lawrence, who commands her, is a native of " New York, well asquainted on the coast of Africa, " and has been at most of the places it is intended the " vessel is to stop at, and is a careful experienced sea- " man."

MARY'D. INSURANCE CO. v. LE ROY & OTHERS.

to its legal effect, as it is, per se, a discharge of the underwriters; and the law attaches no importance to the degree, in cases of voluntary deviation. Necessity alone can sanction a deviation in any case; and that deviation must be strictly commensurate with the vis major producing it.

The declaration was for a total loss by the perils of the sea. The cause was tried upon the issue of *non infregit conventionem*, and the verdict and judgment were for the Plaintiffs with 5476 dollars damages.

Upon the trial of this issue the Defendants (the Plaintiffs in error) took *twelve bills of exceptions*, but as the opinion of this Court was given upon the 7th only, it is deemed unnecessary to state the others.

1. The first bill of exceptions stated not only the *facts* which the Plaintiffs and Defendants offered to prove, but detailed at great length the *testimony*, and *circumstances tending to prove* those facts, or from which they might be inferred. Among other facts it stated that the ship, in the prosecution of her voyage arrived at the island of Fogo, one of the Cape de Verd Islands, on the 7th of May, 1805, where the captain received on board *four bullocks and four jack-asses*, besides water and other provisions, and unstowed the dry goods and broke open two

MARY'D.    bales and took out 40 pieces of each for trade. That
INSU-      the ship remained there until the 24th of May. That
RANCE CO.  the time generally employed by a vessel in taking in
v.         stock and water at the *Cape de Verd Islands* is from two
LE'ROY &   to three days unless the weather should be very unfa-
OTHERS.    vorable; that the weather was good; and that the bul-
———————    locks and jack-asses incumbered the deck much more
than small stock would have done.

7. The 7th bill of exceptions stated that the Defen-
dants gave in evidence all the facts detailed in the pre-
ceding bills of exceptions, and thereupon prayed the
Court to direct the jury, that if they believe the same,
then the taking the said jack-asses on board the said ship
John, while she lay at the Island of Fogo, was not with-
in the privilege allowed to the Plaintiffs in this cause to
touch at the Cape de Verd Islands in the performance
of the voyage insured for the purchase of stock and to
take in water, and therefore vitiates the policy, which di-
rection the Court refused to give; but the Court was of
opinion, and accordingly directed the jury that the taking
in the four jack-asses at the Isle of Fogo as aforesaid,
did not avoid the policy, *unless the risk was thereby in-
creased;* whereupon the counsel for the Defendants
excepted.

MARTIN, *for Plaintiffs in error,*

As to the 7th exception, contended, that the liberty to
touch at the Cape de Verds to purchase stock and take
in water, did not authorize the taking the jack-asses on
board. The natural tendency was to increase the risk—
and it was immaterial whether the risk was in fact in-
creased.

WINDER, *contra.*

The question upon the 7th bill of exceptions is only
whether the Court did right in leaving it to the jury to
decide whether the risk was increased by taking in the
jack-asses. It is like the case of *Livingston and al. v.
The Maryland Insurance Company,* 6, *Cranch* 274, where
this Court decided that the question whether a fact was
*material* to the risk was a question to be decided by a
jury under the direction of a Court.

HARPER, *on the same side.*

As to the 7th bill of exceptions, contended, that it was a question of fact to be decided by the jury, whether the tak ng in the jack-asses increased the risk. This Court has so decided in the case already alluded to of *Livingston v. The Maryland Insurance Company.* The principle of the case of *Rayne v. Bell,* is, that there was no increase of risk and no delay. The case of *Sheriff v. Potts,* is overruled by that of *Rayne v. Bell.* But the license to take in stock included jack-asses.

PINKNEY, *Attorney General in reply,*

The 7th bill of exceptions states in effect that the Court refused to say that the taking in of the jack-asses discharged the underwriters, although it might produce delay. It is not stated that it did not produce delay; and the evidence shows that it did. The principle of deviation is not increase of risk, but *delay.* If therefore here was any delay, the policy was void from that time.

But it is said they had license to take in jack-asses, because they were *stock.* But the order for insurance upon the vessel refers to the preceding order for insurance on the freight, which was written on the same paper, and connected by the word "also." In the order for insurance upon the freight, the *stock* is particularly stated to be "*such as hogs, goats and poultry.*" They could no more take jack-assess under this license, than they could take plows, horses, carts, or goods and merchandize, which are also stock.

The ship had a special license to touch for a special purpose, and *Expressio unius est exclusio alterius.* The contract of insurance is upon a voyage specific as to its nature, destination, &c. If the act done be *calculated to* tend to encrease the risk, it is immaterial whether the risk be actually increased. The case of *Rayne and Bell,* in 9 *East,* 195, in some respects is not law—but in this respect it is good law and supported by analogy. It goes on the ground of *delay or risk.* The case of *Sheriff and Potts,* cited in the late editon of Marshall, is not overruled by *Rayne and Bell,* although *Stitt and Wardell* is.

MARY'D.
INSU-
RANCE CO.
*v.*
LE ROY &
OTHERS.

JOHNSON J. delivered the opinion of the Court as follows:

In deciding on this cause the Court will confine itself to the case made out on the 7th exception. Its decision on the point presented by that exception disposes of the case finally.

The opinion prayed for was, that, by taking *in,* at Fogo, an additional cargo, not sanctioned by the contract of insurance, the insurers were discharged from their liability under the policy. The charge, delivered by the Court, was, that the subsequent liability of the underwriters must depend upon the question, whether any increase of risk resulted from the shipping of that additional cargo.

In this charge, this Court are of opinion, that the Court below erred.

The discharge of the underwriters from their liability in such cases, depends, not upon any supposed increase of risk, but wholly on the departure of the insured from the contract of insurance. The consequences of such violation of the contract are immaterial to its legal effect, as it is, *per se,* a discharge of the underwriters, and the law attaches no importance to the *degree* in cases of voluntary deviation; necessity alone can sanction a deviation in any case; and that deviation must be strictly commensurate with the *vis major* producing it. The case of *Rayne and Bell* has been cited as supporting a contrary doctrine.

Without being understood to acquiesce in the correctness of that decision, it may be remarked that the question was not, in that case, whether the lading, taken in at Gibralter, was within the terms of the policy, as in the present— but what acts were lawful to be done during the delay occasioned by a justifiable cause of deviation. On the contrary, the case of *Sheriff and Potts* was a case of voluntary departure from the stipulations of the policy, and the decision supports the opinion we now give.

It may also be remarked, that, in the case of *Rayne and Bell* the notice which Lord Ellenborough takes of the case of *Sheriff and Potts*, virtually admits the doctrine upon which this Court founds its decision.

The terms of this policy so far as connected with this decision, are, " with liberty of touching at the Cape de " Verd Islands, on her outward passage, for stock, and " to take in water." *Touching,* in its nautical sense, is known to be the most restrictive word that can be adopted in such a case. Construing the license according to the subject matter, and in its necessary connection with the offer on the freight, it could mean no more than permission to provision the vessel with live stock, such as is usual on a voyage, and may be procured at the Cape de Verds.

It might, indeed, admit of a doubt whether any of the larger animals used for food, were included within the policy. The words of the first offer certainly were intended to confine the permission to the smaller animals. Stock is a term of the most general import: In its present extended application, it would include a great variety of subjects that never could have entered into contemplation of the parties.

In what sense was the term used? Is the question to be decided: not what uses it might have been applied to in other contracts, or between other parties. The general want of precision in the language of maritime contracts, is an endless source of litigation among mercantile men. Courts of justice are therefore obliged to resort to such reasons as the nature, object and terms of the contract present, to determine the precise extent of the obligation of the parties.

We feel no inclination to add to the number of causes which vitiate a policy ; but the amount of the premium depends upon such a variety of considerations, (as often suggested by caprice as by judgment,) that the contract, whatever it is, must be substantially adhered to.

*Judgment reversed.*