EASTERN DIST.

*May*, 1839.

HERMANN ET AL,
*vs.*
WESTERN MA-
RINE AND FIRE
INSURANCE CO.

HERMANN, BRIGGS AND CO. *vs.* WESTERN MARINE AND FIRE
INSURANCE COMPANY.

APPEAL FROM THE COURT OF THE FIRST JUDICIAL DISTRICT, JUDGE
BUCHANAN PRESIDING.

When there is nothing in the policy which renders the insurers liable for
the acts of the captain or officers of steam boats, their liability for their
conduct must depend on the law.

Where the testimony of the officers of steam boats states that it is usual
to take vessels in tow in their voyages up and down the river, it cannot
have effect against the insurers, when there is no evidence as to the
*usage* of insurance in such cases, or whether such a privilege is or not
stipulated in the policies.

The business of towing ships and vessels is entirely separate and distinct
from all things connected with or incidental to the navigation of the
river by steam boats, or the transportation of freight and passengers.

So, where a steam boat is lost by the conduct of the captain, in attempting
to proceed on his voyage with a brig in tow, lashed alongside, and it
does not appear there is any clause in the policy allowing the privilege
of taking a vessel in tow, or that the insurers acquiesced in this usage,
the insured cannot recover of the underwriters.

This is an action on a policy of insurance, effected by the
plaintiffs on the steam boat Fort Adams for six months, from
the 25th day of November, 1836, at 6 per cent. premium, on
one-third of the value of the boat, which was fixed at thirty
thousand dollars.    The plaintiffs allege the boat was lost by
one of the perils insured against, to wit, that of the river
Mississippi, and that the defendants are liable as for a total
loss; the usual abandonment having been made by the
owners, and the necessary notice and preliminary proof
made to the underwriters.

The defendants denied their liability, and averred that the
boat was lost in consequence of being overloaded; that her
valuation was excessive, and the premium not paid; that the
boat had been since sold, and the plaintiffs received the price,
which they must refund if they recover.    They further aver

there was no preliminary proof of interest in the plaintiffs, wherefore they pray judgment with costs.

Upon these pleadings and issues the cause was tried.

All the evidence which is material is embodied in the opinion of this court, and need not be recapitulated.

There was judgment for the plaintiffs, allowing them nearly all their claim, from which the defendants appealed.

*Chinn*, for the plaintiffs, contended that the policy, upon its face, showed an insurable interest in the plaintiffs, which rendered their right to sue and recover undoubted. *Hughes on Insurance*, 352.

2. The testimony shows the boat was provided with a skilful and experienced commander, and a competent crew; that she was not overloaded, but had, on previous occasions, carried eleven hundred bales, being one hundred more than her last load. Her guards were above water, and did not touch it. The captain avoided the high wind as much as possible, and lay to all night. In the morning the wind had abated, and he pursued on his voyage until the wind rose, when he made for the shore, and saved all that was in his power.

3. The insured is bound in warranty for the capacity of his vessel, and to provide a skilful and honest commander, and to act in good faith; but it is not every fault or neglect of the captain or crew that exempts the underwriters. " The ship was burned through the neglect of the crew in lighting a fire in the cabin, and, going to rest without seeing it was properly extinguished, and the underwriters were held liable for the loss." *Hughes*, 196.

4. It is clearly deducible from the evidence, that the boat was lost by reason of the storm; by the winds and the waves which arose during the time embraced in the policy, which were the perils insured against.

5. There is also an objection, that there was no regular abandonment. This is proved to have been formally made, but the defendants, refusing to accept, told the plaintiffs to act in the matter, in taking care of the boat, as though they were still the owners, without insurance.

EASTERN DIST.

*May*, 1839.

HERMANN ET AL.

*vs.*

WESTERN MA-
RINE AND FIRE
INSURANCE CO.

6. It is next objected, that there was not a total loss. It is true there was not a physical, total destruction of the thing, but there was an entire loss of the value of the boat to the owners, by the stranding and sinking; this is sufficient to entitle them to recover as for a total loss. *Hughes*, 291.

*Maybin*, for the defendants, insisted that the steamer Fort Adams was not lost by one of the perils insured against, but by being overloaded, or in imprudently venturing out in a storm when she should have laid by. In this she incurred a risk, for which the underwriters are not responsible, as is evident from all the testimony, which shows, that she did not leak, that her timbers were sound, and no injury was done to, or break in them. She was either lost by overloading, or by running in the storm when a proper regard for the interest of all concerned required she should have laid by: in either case, the insurers are discharged. *Hughes*, 139, 140, and 204 ; 1 *Phillips*, 179.

2. There has been no abandonment made in this case, to entitle the plaintiffs to recover as for a total loss. The most they can recover is for the actual loss sustained. The stranding of the boat is not a total loss. 2 *Phillips*, 284-5-6 ; 3 *Gill and Johnson*, 450.

3. There has not, in fact, been made, in this case, the necessary preliminary proof. None has been made except what appears on the face of the policy, when it is made for the benefit of all whom it may concern beside the plaintiffs. 1 *Phillips*, 497, 8.

*Eustis, J.*, delivered the opinion of the court.

This is an action on a policy of insurance on the steamboat Fort Adams. The insurance was for six months, from the date of the policy, and the loss was within that time. The case was tried by the court below, without the intervention of a jury. There was judgment for the plaintiffs, as for a total loss, and the defendants have appealed.

The adventures and perils insured against by this policy, " *are of the river* and fire, and all that have or shall come to

the hurt, detriment or damage of the said steam-boat, engine or any part thereof. The insurers are not liable for damages to the boat's machinery, unless occasioned by external causes or by fire."

By a memorandum, " said boat is to have the liberty to navigate the Mississippi river and such tributaries as are suitable to her class."

EASTERN DIST.
*May,* 1839.

HERMANN ET AL.
*vs.*
WESTERN MA-
RINE AND FIRE
INSURANCE CO.

The manner in which the loss occurred, is best explained in the words of the witnesses.

The protest made under oath by the master, mate, engineers and carpenter, on the 26th December, 1836, is as follows : " That said steam-boat being tight and strong, well manned, filled and provided, and partially laden with cotton, they departed with her from Coles' Creek, on the Mississippi, bound for New-Orleans, on the 6th December, 1836 ; on the same day reached Natchez, where they took in tow the brig Auguste, bound to New-Orleans, and again proceeded ; on the 7th, they reached Fort Adams, where the steam-boat completed her loading, and the brig also took in some cotton. On the 8th, the steam-boat being in perfect order and in fair running trim, they started from Fort Adams to continue their intended voyage, with the brig lashed to their star-board side ; towards the latter part of the day it came on to blow heavy, with considerable sea on the river. At seven, P. M., stopped at the wood-yard opposite to Tunica Island, to replenish fuel ; during this time the wind and swell increas-ing and the night setting in dark, with every appearance of a storm, the master determined to lay by until morning. On the 9th, at four, A. M., the weather moderating, they got under way, but at daylight it again came on to blow heavy ; wind up stream, gradually increased to a gale, causing a labor, some chopping sea against the current, which made both the steam-boat and brig pitch and strain excessively. At half past eight, A. M., found the boat was leaking, and on exami-nation being immediately made, they discovered that the hold was rapidly filling. On this emergency, the master caused her to be steered for the shore ; directing at the same time the crew of the brig to prepare to cast off ; this was not

EASTERN DIST.
*May*, 1839.

HERMANN ET AL.
*vs.*
WESTERN MA-
RINE AND FIRE
INSURANCE CO.

however done until they came very near, when the brig unlashed and came to anchor ; and the boat shooting ahead, took the ground on Port Hudson bar, a little above Thompson's Creek, with her head on shore and touching abaft ; lines were immediately carried out, and the boat so secured as to prevent her from sliding off the bank. A stage was next rigged forward, to prevent further damage, if not total loss."

This, by the agreement of counsel, is to be considered as evidence, except so far as relates to the testimony of the master and John Bennet, the pilot. In the examination of the captain as a witness, he states "that he commanded the steam-boat Fort Adams in December last, at the time of her loss on the Mississippi river, and caused a protest to be made thereof before a notary public, which is on file, and has been read by him, and the facts stated therein are true. On being further interrogated, he says, that upon the trip in which the said boat was lost, she was laden with cotton, having on board about one thousand bales. He considered the said boat fully competent to the transportation of her then cargo in the waters of the Mississippi river, for she had before that time frequently transported more than eleven hundred bales. He has been conversant with the business of steam-boating on the Mississippi for four or five years. He has always considered it a part of the business of steam boats to take brigs and other vessels in tow, in descending and ascending the Mississippi river. He has known a great many boats to do so."

*Cross-examined :* He says, " that when he speaks of the facts stated in the protest being true, he means so far as his knowledge of them extends, as he was absent from the boat some days after the loss; that he supposes she is about ten or twelve months old, her tonnage about two hundred tons, and when she had eleven hundred bales of cotton on board, she was then plying between Natchez and New-Orleans ; and had carried as much cotton two or three times before, with some sugar. He cannot say that the gale blew hard all night when he stopped to wood, but that about four o'clock in the morning, of the 9th December, the wind had ceased

to blow hard, when he started ; and that about five o'clock Eastern Dist. *May,* 1839. it began to blow fresh, and continued so until the accident happened, but not steadily. Sometimes it would blow fresh HERMANN ET AL. and cease a little ; that the brig was lashed by the steam- *vs.* WESTERN MA- boat all this time. He cannot say where the leak was, and RINE AND FIRE on discovering that the boat was leaking, he went down to INSURANCE CO. the fire room, where he found the water was coming on her guards, but did not discover any water in her hatches, until they were going into shore, when she took the ground a short time after they first discovered she was leaking."

" At the time of the accident, he thinks the brig was to the windward of the Fort Adams ; that he does not think the brig caused the boat to careen ; they kept an even keel. The towing the brig, he thinks, did not affect the steamboat in any other manner than to impede her progress. The cotton was dry when shipped. The heavy swell caused the water to break on the guards, the under sides of which might have touched the water, but were not under water. He has been in heavier swells, on the river Mississippi, than the one in question, but never experienced an accident like this. The first boat he commanded was in 1833."

Bennet, the pilot, deposed, that " at the time of the loss of the Fort Adams, she was laden with one thousand bales of cotton ; that on former trips she had carried eleven hundred bales in safety. He has been accustomed to steam-boating six or seven years, and has always considered it in accordance with the customs of trade, for steam boats to take in tow, brigs and other vessels on the waters of the Mississippi. He believes the loss of the Fort Adams arose from the tempestuous weather which she encountered. He was, however, the second pilot, and as far as he knows, the protest which he signed is correct."

*Cross-examined :* Says " the boat was not so deeply laden when she sunk, as on former trips. During the night of the 8th December, the gale was not heavy when the boat laid to in an island chute, where the wind had no effect on her. The gale commenced the next morning between seven and eight o'clock. They started about four o'clock, and it was

EASTERN DIST.
    May, 1839.
————————
HERMANN ET AL.
    vs.
WESTERN MA-
RINE AND FIRE
INSURANCE CO. only a short time before the leak was discovered, that the swell was so great. The wind then very high and up the river. It was not more than eighteen or twenty minutes, before the boat was discovered leaking, that the wind blew very fresh; the brig was lashed to the steam-boat during the whole time, and all the previous night. He was at the wheel, when they started in the morning, and when they rounded to the shore. No injury happened to the brig, and he does not think that towing the brig caused the steam-boat to careen. It is a general thing for vessels to be towed up and down the river by steam boats. That the wind was ahead all the time they had the brig in tow, and when they discovered the Fort Adams was sinking; but the towing the brig did not interfere with the steering of the steam-boat. She was not quite a year old, and built at Cincinnati."

The Fort Adams was afterwards abandoned to the underwriters, and we shall assume, for the purposes of this inquiry, that *the loss was constructively total.*

Captain Spedden, an inspector of three of the insurance offices of this city, says, that "he knows the steam-boat Fort Adams; examined her previous to the accident, but saw nothing defective about her; she was a new boat. Witness was inspector of defendants' office, and it was his duty to examine her carefully, and she was sound, and numbered as the first class of boats. Witness, with captain Robertson and Stockton, met on board of her, when she was brought to the city after the accident, to examine her, and found nothing the matter with her. Every thing appeared to be in its place. This was a short time after she was brought down. They gave her a thorough examination and discovered nothing about her, only that some of her seams had opened in consequence of her having been sunk. There was no strain or breach about her, which could have caused her sinking. She was brought down here some time last summer. He saw no repairs that had been done to her."

James Stockton, witness for defendants, says, "he had an opportunity of examining the Fort Adams, with captains Spedden and Robertson, and is himself inspector of

EASTERN DIST.
*May*, 1839.

HERMANN ET AL.
*vs.*
WESTERN MA-
RINE AND FIRE
INSURANCE CO.

three insurance offices in New-Orleans. He examined before and since the accident. She was a first class boat, nearly new, and tight and strong. He examined her on her return, with those gentlemen, sometime between July and September, 1837, and confirms captain Spedden's testimony. The Fort Adams was again sunk on the opposite side of the river, from New-Orleans, in the gale about the 1st of October, 1837."

Captain Robertson confirms this statement. Captain Gillet, who purchased the Fort Adams at the sale made at public auction after the abandonment, corroborates the testimony of these witnesses, and we think that their account of the condition of the boat, is conclusive.

I. The question submitted to us, is whether under these facts the insured can recover?

It must be observed, that there is nothing in the policy which renders the insurers liable for the acts of the captain or officers of the steam-boat: their liability on this subject depends entirely on the law.

When the steam-boat was at Natchez, the captain took in tow a brig, and when the loss occurred, the brig was lashed alongside of the steam-boat. The witnesses, all of whom are or have been engaged in the navigation of steam boats on the river, state that it is usual for steam boats to take vessels in tow in their voyages up and down the river; but we have no evidence as to the usage of insurance in that case, and we are not informed whether such a privilege is or not stipulated in the policies. The business of towing ships is entirely separate and distinct from all things connected with or incidental to the navigation of the river by steam boats, or the transportation of freight and passengers. An usage which would throw this additional risk on insurers, at least ought to have been proved to have been acquiesced in by those most affected by it. *Louisiana Code, article* 3. If the owners of steam boats wish to have the privilege of towing vessels, let a clause to that effect be inserted in the policies of insurance. The towing a heavily laden ship by a steam-boat, with her tiers of cotton on deck, necessarily

When there is nothing in the policy which renders the insurers liable for the acts of the captain or officers of steam boats, their liability for their conduct must depend on the law. Where the testimony of the officers of steam boats state that it is usual for them to take vessels in tow in their voyages up and down the river, it cannot have effect against the insurers, when there is no evidence as to the usage of insurance in such cases, or whether such a privilege is or not stipulated in the policies. The business of towing ships and vessels is entirely separate and distinct from all things connected with or incidental to the navigation of the river by steam boats, or the transportation of freight and passengers.

EASTERN DIST. *May*, 1839.

HERMANN ET AL. *vs.* WESTERN MA- RINE AND FIRE INSURANCE CO.

So, where a steamboat is lost by the conduct of the captain in attempting to proceed on his voyage with a brig in tow lashed alongside and it does not appear there is any clause in the policy allowing the privilege of taking a vessel in tow, or that the insurers ac- quiesced in this usage, the in- sured cannot re- cover of the un- derwriters.

impedes her progress, and it is idle to say does not increase the risk of the boat. "The meaning of the contract of insurance for the voyage is, that the voyage shall be per- formed with all safe, convenient and practicable expedition, and in the regular and customary track. The shortness of the time, or of the distance of a deviation, makes no difference as to its effect on the contract." 3 *Kent's Commentaries*, 312. In principle, this rule relates to an insurance on time. The insured cannot subject the insurer to risks not assumed by his contract. We must have other evidence as to *such an usage* before we can permit it to change the terms of a written contract, and to subvert what we consider an elementary principle of the law of insurance.

II. The loss in this case was caused by the conduct of the captain, in attempting to proceed on his voyage with the brig lashed alongside of the steam-boat. The condition of the weather was such as to have put any prudent man on his guard against attempting to navigate a steam-boat loaded with cotton, with this additional incumbrance. What could have been easier than to have cast off the brig, thus saving the property and lives entrusted to his charge, from this unnecessary danger, for it is in vain to contend that the additional weight of the vessel did not contribute to, if not directly produce the disaster. Had the boat been perfectly free, there is no evidence which satisfies us that she might not have proceeded on her voyage in safety. No injury was done to the brig, and none to the steam-boat by the force of the winds and waves, other than that which was caused by their being connected together in one unweildy mass. This conclusion is forced upon us by the facts of the case.

Who is answerable for this conduct of the captain? This depends on principles which are elementary of the law of insurance. We have seen that by the policy, the insurers do not take upon themselves any responsibility for the acts of the captain. The master is for the purposes of naviga- tion, the agent of the owner of the ship, and the owners and not the insurers, in this case, are to bear the consequences of his neglect, unless the latter by their contract have taken

upon themselves to answer for him.   *Valin, book* 3, *title* 6,
*article* 23.   *Emerigon, Contract of Insurance, chapter* 4, *section*
4, *section* 2 *and* 3.

It is, therefore, ordered, adjudged and decreed, that the
judgment of the District Court be reversed, and judgment
entered for the defendants, with costs in both courts.