261 F.2d 490
 KANSAS CITY FIRE & MARINE INSURANCE COMPANY, Appellant &
Cross-Appellee,
v.
DAN ARIAS SHRIMP CO., Inc., Appellee & Cross-Appellant.
DAN ARIAS SHRIMP CO., Inc., Appellant & Cross-Appellee,
v.
KANSAS CITY FIRE & MARINE INSURANCE COMPANY, Appellee &
Cross-Appellant.
 No. 17119.
 United States Court of Appeals Fifth Circuit.
 Nov. 21, 1958, Rehearing Denied Jan. 15, 1959.
 
 John P. Corcoran, Jr., and William E. Henson, Jr., Tampa, Fla., for appellant.
 R. C. Ballard Trigg, Roger D. Flynn, of Dixon, Flynn & Trigg, Tampa, Fla., for appellee.
 Before RIVES, TUTTLE, and JONES, Circuit Judges.
 RIVES, Circuit Judge.
 
 
 1
 This appeal is from a judgment entered on a jury verdict based on a policy of marine insurance covering the shrimp trawler Celestino Arias for the period November 22, 1954, through November 22, 1955. The vessel was customarily employed in the catching of shrimp in the Gulf of Mexico outside the coastal waters of Campeche, Mexico, a distance of approximately six hundred miles from its home port, Tampa, Florida.
 
 
 2
 On August 27, 1955, the vessel left Tampa en route to the fishing grounds off Campeche with a crew consisting of its master and two crewmen. About seventy-two hours out, its main engine broke down because of failure of its oil pump. Upon advice of the Coast Guard vessel Corrigan, the shrimp trawler was towed to Campeche, a distance of approximately one hundred fifty miles. No pump was available there, and the owner, contacted by radio telephone, sent by sea a replacement pump, which, however, upon arrival, proved to be the wrong kind of pump. The owner was again contacted, and this time caused the right type of pump to be flown from New Orleans to Campeche. During about a twelve-day layover in Campeche, a local Mexican mechanic installed the pump, and the vessel returned to sea to begin fishing at a point approximately fifty miles from Campeche. About four days later, the oil pump which had just been installed failed, and the main engine was rendered inoperative. Again the vessel was towed, this time to Campeche Flats about twelve miles out from Campeche. There, a mechanic from a Coast Guard cutter came aboard, but was unable to make the necessary repairs. The master of the shrimp trawler then called the owner by radio telephone and explained the situation. The jury could reasonably have believed that it was the master who suggested to the owner that the vessel be towed back to Tampa, that the owner concurred in the suggestion, and that the ultimate decision was that of the master.
 
 
 3
 The trawler gave its ice and fuel to other vessels belonging to the owner, and on September 24, 1955, left Campeche Flats under tow by the vessels St. George and Lady Lynn en route to Tampa, Florida.
 
 
 4
 The St. George was in the lead with its cables hooked to the Lady Lynn, and the wire cables of the Lady Lynn were fastened to the sampson post[1] of the Celestino Arias. The weather had been good while the vessel was lying at anchor in Campeche Flats, but the master testified that about one and a half to two days out the vessel encountered heavy weather which he thought was part of Hurricane Janet.[2]
 
 
 5
 As a result of the wrenching and yawing of the two lines, the sampson post came loose from the keel and struck the planking of the vessel causing a leak below decks. The gasoline auxiliary pump could not make headway against the water. As the water continued to gain, the cables were cut loose from the Lady Lynn, and the crew of the Celestino Arias, using their life preservers, abandoned ship and were rescued by the Lady Lynn. The vessel sank in about one hundred fathoms of water. The Lady Lynn and St. George proceeded to Tampa without mishap.
 
 
 6
 In the usual picturesque language, the policy insured against loss of the vessel due to the perils of the sea. As to being towed, the policy provided:
 
 
 7
 '* * * but if without approval of Underwriters the Vessel be towed, except as is customary or when in need of assistance or undertakes towage or salvage services under a prearranged contract made by owners and/or charterers, the Assured shall notify Underwriters immediately and pay premium if required but no such premium shall be required for customary towage by the Vessel in connection with loading and discharging.'
 
 
 8
 The district court considered that the principal issue was whether the Celestino Arias was sunk as a result of the perils of the sea. It charged the jury in part as follows:
 
 
 9
 'The defendant insurance company claims that the insured boat was not lost because of a peril of the sea, but that the proximate cause of the loss was the towing of the disabled boat from where she was in a disabled condition near Campeche to Tampa, Florida, while the boat was unseaworthy because of the failure of the motor by which the boat was propelled. It is not disputed and the evidence shows that the disabled boat was towed from a point near Campeche across or through the Gulf of Mexico to the Port of Tampa, and during which towage or voyage the Plaintiff claims that rough weather was encountered, the severity of which caused the sampson post to which the towage cables were attached to become loosened, and thereby by causing a leak to occur in the hull of the boat which permitted the water to fill and sink the boat.
 
 
 10
 'It is the plaintiff's claim that rough seas caused by the approach or nearness of a hurricane was a peril of the sea which proximately and directly caused the leak to occur and the boat to sink. The Court will later define proximate cause as used in these instructions.
 
 
 11
 'Now, it is the claim of the defendant that the insured should have taken the disabled boat to the Port of Campeche instead of having her towed to the Port of Tampa, and that such conduct on the part of the insured amounted to a breach of duty on the part of the insured. If the jury believe from a preponderance of the evidence, considering all the facts and circumstances, that prudence dictated that the disabled boat be taken to the Port of Campeche instead of to the Port of Tampa, then, of course, the plaintiff cannot recover in this action and your verdict would be for the defendant.
 
 
 12
 '* * * It is essential, as already pointed out, for recovery that the plaintiff establish to your satisfaction by the greater weight of the evidence that the vessel was lost due to the perils of the sea and not because of lack of due diligence upon the part of the plaintiff.
 
 
 13
 '* * * Now, the Court instructs the jury that the words 'peril of the sea' do not mean all losses that occur from maritime adventures. The defendant undertakes only to insure against extraordinary forces and not against those ordinary ones to which every ship must inevitably be exposed and which can be guarded against by the ordinary exertion of human skill and prudence. If the conditions encountered at sea were not extraordinary or unusual but were ordinary, usual and natural conditions that were to be expected they were not perils of the sea.'
 
 
 14
 The jury returned a verdict for the plaintiff for the face amount of the policy, $35,000, plus interest and judgment was entered thereon.
 
 
 15
 By motion for summary judgment, motion for directed verdict, requests for special instructions, and motion for new trial, the defendant preserved two points for review upon this appeal:
 
 
 16
 'I.
 
 
 17
 'The towing of the vessel Arias from its safe anchorage within twelve miles of the Port of Campeche, approximately six hundred miles across the Gulf of Mexico to Tampa, Florida, during the hurricane season without Kansas City's permission, constituted a deviation of risk which is not insured under the insuring agreement.
 
 
 18
 'II.
 
 
 19
 'The owner in advising the master to have the vessel towed from its safe anchorage within twelve miles of the Port of Campeche to the Port of Tampa, Florida, six hundred miles away during hurricane season with its main engine and pump inoperative breached the implied warranty not to send the vessel to sea in a deficient condition.'
 
 
 20
 I. The first defense of deviation proceeds upon the sound theory that an insured cannot subject his insurer to a different risk from that assumed under the contract.[3] By the express terms of the policy, the vessel was covered while being towed 'when in need of assistance.' Accordingly, the appellant has not objected to the two earlier instances of towing, namely, (1) from the point of original breakdown to Campeche, a distance of about one hundred fifty miles, and (2) from the point of the second breakdown to Campeche Flats, about twelve miles from Campeche, a towing distance of about thirty-eight miles. The question is whether the attempted towage of the vessel some six hundred miles to the Port of Tampa rather than twelve miles to the Port of Campeche was a deviation not justified by the phrase 'when in need of assistance.' No objection was taken or exception reserved to the manner in or terms by which that question was submitted to the jury other than that the question should be decided in appellant's favor as a matter of law.
 
 
 21
 As to his reasons for the decision, the master testified:
 
 
 22
 'Q. You have testified previously that you had recommenced the boat be towed to Tampa. Why did you make that recommendation? A. Because the same thing that was fixed in Campeche, Mexico was the same thing that broke again, and in Campeche you don't have adequate ways of getting things fixed, no mechanical-- there is not a good mechanic there. The mechanic I had must have been out of some filling station or somewhere. He didn't know exactly what he was doing. I was in the engine room when he fixed it. He put it back on, but if we had gone back possibly the same thing would have happened again.'
 
 
 23
 No one would contend that either the master or the owner deliberately imperiled the vessel and the lives of the crew, or exercised bad faith in making the choice. The decision was primarily one for the master, though it could not be an utterly unreasonable or arbitrary decision. As said in Couch, Cyclopedia of Insurance Law, Vol. 5, Sections 1073(b) and (e), pp. 3725, 3727:
 
 
 24
 'The judgment and discretion of a Master of ordinary skill also constitutes an important factor. In fact, the master, assuming that he is of competent skill and prudence, must be the principal judge of the degree of peril to which his ship is exposed, of her ability to withstand the same, of the necessity of departing from the usual course of the voyage, and whether the ship may safely proceed to a nearer or more distant port for repairs, etc., and also which port offers, under the circumstances, the greatest facility for repairs.'
 
 
 25
 'If an insured vessel is so damaged as to render it unsafe in the judgment of a Master of competent skill, prudence and discretion for her to proceed on her voyage without repairs, he shall seek the nearest port practicable therefor, and the Master must be the principal judge of the degree of peril to which his vessel is exposed and of her ability to withstand the same, of the necessity of departing from the usual route, and whether he may safely proceed to a nearer or more distant port for repairs, as well as which port under the circumstances affords the greatest facility for repairs. He is not obligated to seek the nearest port out of the regular course of the voyage if the peril is not imminent. In fact, the Master must, in determining what port to seek for repairs, consider the extent of the damage, the distance of the port from the course of the voyage, the facility afforded, and the quickness with which the necessary material can be procured, and although there are other nearer ports, the vessel may seek the proper place for repairs * * *.'
 
 
 26
 Viewed from hindsight, after the vessel has been lost, it is easy to see that the choice was an unfortunate one, and that it would have been better to have towed the vessel twelve miles into Campeche, and to have flown in another oil pump and, if necessary, a skilled mechanic for its installation. Viewed from foresight, as of the time the decision was made by the master with the approval of the owner, we cannot say as a matter of law that the decision was so unreasonable or arbitrary as to constitute the longer towage a deviation from the risks insured under the policy.
 
 
 27
 II. In Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa., 5 Cir., 1957, 247 F.2d 116, 119, 120, this Court said:
 
 
 28
 '* * * the owner's obligation under a Time Policy, as was this one, is extremely limited: the vessel is seaworthy at the attachment of the insurance, but henceforth it is a sort of negative warranty, i.e., the owner or those in privity with him will not knowingly send the vessel to sea in a deficient condition.
 
 
 29
 '* * * Of course, a defect in machinery or a defect in a hull means that the vessel is thereby unseaworthy since, with such defect, the machinery or hull, cannot comply with the classic definition of 'reasonably suitable' for the purposes intended. The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; Compania de Navegacion, etc., v. Fireman's Fund Insurance Co., 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787. The only limitation on this is that the defect be latent and one not known or discoverable by the owner or one in privity with him.'
 
 
 30
 Mr. Donald Solomon, who operated fifteen shrimp boats and had been at sea for twenty years, testified:
 
 
 31
 'Q. Would you consider a point twelve miles from the shore of a country over water as being at sea? A. Yes, sir, that is at sea.
 
 
 32
 'Q. That is at sea at that point? A. Yes, sir.
 
 
 33
 'Q. Is there any point in between there and the land that you would determine that you were not at sea? A. Normally that is considered when you are inside of the jetty or the bay which is in a protected area, which is inside of the land.'
 
 
 34
 There was no contrary testimony. If, however, we overlook the point of the vessel being technically 'at sea,' it is clear that the policy permitted the towing of the vessel 'when in need of assistance,' and, hence, when unseaworthy. Hence, virtually the same views employed in deciding the first point will suffice to decide the second.
 
 
 35
 In a case where a like decision had to be made of getting the vessel from a point at sea to a point where the necessary repairs could be effected, the court said:
 
 
 36
 '* * * If, after leaving the port of departure, the injury happens, then the master of the boat is vested with reasonable discretion. He is not bound, because some little defect happens, to stop his boat. If it was a sea voyage, he could not do it, perhaps; he is not always bound to turn to the nearest port; that will depend on the nature of the injury,-- the extent which it affects the ability of the boat to make a successful voyage. He is bound to use a reasonable discretion, and, at the nearest convenient port, to remedy any defect which makes the boat unseaworthy. And what is the nearest convenient port depends upon the facts of the case; what is the imperativeness of the necessity depends upon the extent of the injury.' Seaman v. Enterprise Fire & Marine Ins. Co., C.C.E.D.Mo.1884, 21 F. 778, 781, 782.
 
 
 37
 We find in this case no breach of the implied warranty not to send the vessel to sea in a deficient condition.
 
 
 38
 The plaintiff below has cross-appealed, claiming that the district court in ruling '* * * that attorneys' fees under the Florida Statutes is not assessable in this case.' The cross-appellant relies on a statute originally enacted in 1893 and amended in 1917, providing recovery of attorneys' fees in actions brought on life insurance, fire insurance, and generally on other insurance policies, Section 625.08 Florida Statutes, F.S.A.:
 
 
 39
 '625.08 Attorney's fees in certain cases upon contracts and policies of insurance
 
 
 40
 'Upon the rendition of a judgment or decree by any of the courts of this state against any insurer in favor of the beneficiary under any policy or contract of insurance executed by such insurer, there shall be adjudged or decreed against such insurer, and in favor of the beneficiary named in said policy or contract of insurance, a reasonable sum as fees or compensation for his attorneys or solicitors prosecuting the suit in which the recovery is had.
 
 
 41
 'The amount to be recovered for fees and compensation for attorneys and solicitors against such insurer shall be ascertained and fixed by the court in chancery cases or a jury in common law actions, from testimony adduced for that purpose, and shall be included in the judgment or decree rendered in such cases.'
 
 
 42
 The cross-appellee contends that that section was never intended to apply to marine policies covering risks on the high seas outside of the State of Florida, and that such policies are more specifically covered by the Florida 'unauthorized insurers process law' enacted in 1949, now Sections 625.28-625.33, Florida Statutes F.S.A. Section 625.29 states the purpose of those sections, 'to subject certain insurers to the jurisdiction of courts of this state in suits by or on behalf of insureds or beneficiaries under insurance contracts.' Section 625.32 provides for attorneys' fees as follows:
 
 
 43
 '625.32 Attorney fees
 
 
 44
 'In any action against an unauthorized foreign or alien insurer upon a contract of insurance issued or delivered in this state to a resident thereof or to a corporation authorized to do business therein, if the insurer has failed for thirty days after demand prior to the commencement of the action to make payment in accordance with the terms of the contract, and it appears to the court that such refusal was vaxatious and without reasonable cause, the court may allow to the plaintiff a reasonable attorney fee and include such fee in any judgment that may be rendered in such action. Such fee shall not exceed twelve and one-half per cent of the amount which the court or jury finds the plaintiff is entitled to recover against the insurer, but in no event shall such fee be less than twenty-five dollars. Failure of an insurer to defend any such action shall be deemed prima facie evidence that its failure to make payment was vexatious and without reasonable cause.'
 
 
 45
 Section 625.33 provides exemptions as follows:
 
 
 46
 '625.33 Exemptions
 
 
 47
 'The provisions of 625.28-625.32 shall not apply to any action, suit or proceeding against any unauthorized foreign or alien insurer arising out of any contract of insurance
 
 
 48
 '(1) covering reinsurance, ocean marine, commercial aircraft or railway insurance risks, or
 
 
 49
 '(2) against legal liability arising out of the ownership, operation or maintenance of any property having a permanent situs outside of this state, or
 
 
 50
 '(3) against loss of or damage to any property having a permanent situs outside this state, where such insurer enters a general appearance or where such contract of insurance contains a provision designating the insurance commissioner and his successor or successors in office or designating a Florida resident agent to be the true and lawful attorney of such unauthorized insurer upon whom may be served all lawful process in any action, suit or proceeding instituted by or on behalf of an insured or beneficiary arising out of any such contract of insurance and service of process effected on such commissioner, his successor or successors in office or such resident agent shall be deemed to confer complete jurisdiction over such unauthorized insurer in such action.'
 
 
 51
 The cross-appellee, Kansas City Fire & Marine Insurance Company, is a corporation under the laws of the State of Missouri engaged in the business of insuring ocean marine risks. The policy itself was delivered to the cross-appellant, a Florida corporation, in Tampa, Florida. It was countersigned by Y. E. Hall, a Florida resident agent, under the endorsement, 'This policy is hereby countersigned below by a resident agent of the State of Florida, to comply with the resident agent's law of said State.' So far as appears, the designation of a resident agent was under Section 625.33(3), supra, and cross-appellee was an 'unauthorized insurer' within the meaning of that and the other provisions of the Florida 'unauthorized insurers process law.' Section 625.33, supra, then exempted this action from the attorney fees provisions of Section 625.32, supra. The more drastic provisions of Section 625.08, supra, therefore have no application. In our opinion, the court correctly ruled that attorneys' fees are not assessable.
 
 The judgment is therefore
 
 52
 Affirmed.
 
 
 
 [1]
 The sampson post was a heavy timber about ten inches by twelve inches, located near the bow of the vessel, which went down through the deck and was affixed to the keel
 
 
 [2]
 The master testified in part:
 'Q. What was the condition of the seas? A. The night we lost the boat the seas were higher than the mast. They were as high as this building, some of them.
 'Q. How high is that? A. As high as this Courtroom here. I don't know exactly how high that is. They were high enough.
 'Q. What were the wind conditions? A. Well, I couldn't say how hard the wind was blowing, but it was blowing gale force. It was high winds.'
 
 
 [3]
 See Maryland Insurance Co. v. Le Roy, Bayard & McEvers, 1812, 7 Cranch 26, 11 U.S. 26, 3 L.Ed. 257; The Indrapura, D.C.1909, 171 F. 929, 931; Hermann Briggs & Co. v. Western Marine and Fire Insurance Company, 1839, 13 La. 516. See also, 5 Couch on Insurance, 1073, p. 3709