**UNITED STATES of America**

v.

**Frank GERVATO.**

**Crim. No. 71–434.**

United States District Court,
E. D. Pennsylvania.

March 1, 1972.

On Motion for Reconsideration
March 10, 1972.

———◆———

Louis C. Bechtle, U. S. Atty., Victor L. Schwartz, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Stanford Shmukler, Philadelphia, Pa., for defendant; Richard P. Abraham, Philadelphia, Pa., of counsel.

## OPINION AND ORDER

NEWCOMER, District Judge.

This case is before the Court on defendant's Motion to Suppress Evidence.

There is some conflict of testimony as to certain of the facts in this case, which the Court has resolved in its best judgment in the following statement of facts.

On March 23, 1971, agents of the Federal Bureau of Narcotics and Dangerous Drugs (BNDD) obtained a search warrant to search the home of Frank Gervato, for Dimethyltryptamine, a controlled dangerous drug, and chemicals and equipment used in the manufacture thereof. Gervato had been under intensive investigation in the two to three week period immediately preceding the issuance of the warrant, which investigation had involved rather lengthy surveillance of Gervato on at least two occasions and probably more, as well as an investigation into the scope and nature of his employment as a supervisor of various processes at Famous United Meat Products Co. of Philadelphia.

The premises to be searched were placed under surveillance on the day in question, March 23rd, around 12:30 p. m. Gervato left the premises sometime after 1:00 p. m. After the agent in charge of the investigation procured the warrant, at 2:00 p. m., he proceeded to his office to await the arrival of BNDD chemists to assist in executing the warrant. The chemists arrived at 4:30 p. m. and the party left at 5:30 p. m. and arrived at the premises to be searched around 6:00 p. m. When they got to the scene the agent bearing the warrant was informed by his surveillance party by radio that Gervato probably was not home. The record is silent concerning previous radio contact between the surveillance party and the bearer of the warrant, but it is fair to assume that this is likely, since the agent who got the warrant was the head of the investigation. The surrounding facts are such as to charge the Agent with reasonably certain knowledge that the premises were unoccupied. The bearer of the warrant, together with other persons in the search party, then proceeded to Gervato's door, knocked, and announced his purpose and authority. Expecting no reply, and receiving none, the agent then broke in the door.

An examination of the direct testimony of the agent who made the entry and the testimony of defense witness Sokol leads to the conclusion that Sokol was in his delicatessen when the door was broken, and responding to the noise of the entry, came through the door connecting the delicatessen to defendant's dwelling and met the agents after they had entered. The warrant was then executed and the agents left approximately one-half hour before defendant returned home at about 9:30 p. m.

Defendant has urged several grounds for the suppression of the evidence procured in this search. First, that there was not probable cause to issue the warrant; second, that the warrant was overly broad; third, that the search was overly broad; fourth, that the warrant was a daytime warrant executed in the night; and fifth, that the entry of the officers was in violation of the rights of defendant and rendered the search unreasonable. Because we dispose of the entire matter on the fifth issue, we need not consider the others. We will assume for purposes of this opinion that the warrant was valid and was validly executed as regards the time of day and the scope of the items seized.

At first blush, it would appear that any attack on the validity of the execution of the warrant because of the manner of entry, especially one involving the breaking of a door, would have to be governed in some way by 18 U.S.C. § 3109, which deals with the authority to break doors and windows as follows:

"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.".

However, for reasons which will be explained at length below, we find that § 3109 has no bearing on the case at bar, either as an authorization justifying the agent's conduct or as an authority forbidding the conduct.

The Espionage Act of 1917 included a section codifying the procedures to be followed in the execution of search warrants, the first such section in a Federal statute, which included, *inter alia*, the two paragraphs which were later codified as 18 U.S.C. § 618 and § 619 and afterwards, in the words of the historical note in U.S.C.A., "consolidated with minor changes in phraseology but without change in substance" and finally codified in 1948 as 18 U.S.C. § 3109. The interpretation of these provisions and their effect was first addressed in United States v. Maresca, 266 F. 713 (S.D.N.Y.1920) and United States v. Yuck Kee, 281 F. 228 (D.Minn.1922). The following passage from *Yuck Kee* is most instructive:

"The question is raised whether the procedural provisions in Title 11 of the Espionage Act are general in nature, applying to all search warrants, or were intended to be confined to proceedings under the Espionage Act, leaving other search warrants to be governed by the common law."

"On the one hand, attention is called to the fact that when the National Prohibition Act (41 Stat. 305) was passed it was specially provided therein that issuance of search warrants thereunder should be governed by Title 11 of the Espionage Act, and Section 23 of Title 11 (Section 10496¼v) is also referred to as tending to show that the provisions of Title 11 were not intended to have application to search warrants generally. On the other hand, it is pointed out, in the case of United States v. Maresca (D.C.) 266 F. 713, 725, that Title 11 of the Espionage Act was taken almost bodily from the Code of Criminal Procedure of New York (§§ 791–810), and this is quite apparent from a comparison of the two statutes. It is further pointed out, in the same case, that those sections of the New York Code of Criminal Procedure were simply declaratory of the historic common law, citing People ex rel. Robert Simpson Co. v. Kempner, 208 N.Y. 16, 101 N.E. 794, 46 L.R.A.,N.S., 970, Ann. Cas. 1914D, 169 . . . . In view of the foregoing, it would seem unnecessary to determine whether the issuance, service, and execution of the search warrant in the case at bar were governed by Title 11 of the Espionage Act, or by the common law. The requirements of both are the same." United States v. Yuck Kee, supra, at 230.

This view has been substantially affirmed by every opinion we have found that has considered the matter. Giles v. United States, 284 F. 208 (1st Cir., 1922); United States v. Lai Chew, 298 F. 652 (N.D.Cal., 1924); Pappas v. Lufkin, 17 F.2d 988 (D.Mass., 1927). See also Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1322 (1958).

The subsequent minor revisions and re-codifications have dispelled the early courts' doubts as to the applicability of § 3109 to the execution of all warrants in appropriate situations, but nothing appears to have changed its basic character as a codification of common law, and this status raises some special considerations of statutory con-

struction. The theoretical advantages of reducing certain common law principles to a code are numerous. It is clear, however, that codification is usually selective as a matter of practical necessity and unless it appears as an affirmative fact that a codification is intended to expound all the law to be applied to an area in which codification is undertaken, the adage *inclusio unius est exclusio alterius* has no application, and situations not covered in the codification are left to common law.

The Court has concluded, for reasons to be given shortly, that § 3109 is a codification of common law principles that developed without contemplation the kind of situation before the Court. As we will show below, the common law antecedents of § 3109 were never applied or intended to apply to situations where the executing officer served a search warrant at a person's regular abode with actual knowledge that the person was absent therefrom. It follows from this that § 3109 has no bearing on the case and that we cannot rely on a strained definition of the word "refused" to justify such an entry.[1] We must look to the common law and the historical context of the Fourth Amendment guarantee against unreasonable searches and seizures, in order to judge if the agent's conduct on the facts before us rendered the search "unreasonable".

We will start our discussion of the common law regarding the right of an officer executing a search warrant to go to a man's home knowing it to be unoccupied and then to break the door to serve the warrant, by observing that passages startlingly parallel to 18 U.S.C. § 3109 in both content and language may be found in Burn's Justice of the Peace and Parish Officer (first published in 1754) applying, not to the execution of search warrants, but to the execution of arrest warrants (30th Ed., at

p. 303). This is not surprising, for the authorization to search premises grew up as an authority ancillary to the power to arrest. The authority to break a door to execute an arrest warrant was first recognized in the 13th Yearbook of Edward the IV at folio 9 (See Judge Prettyman's opinion in Accarino v. United States, 85 U.S.App.D.C. 394, 179 F.2d 456, at 460 [1949]). The right of a justice of the peace to issue a warrant including the power to search the premises must have been novel in Coke's time, even restricted as it was to stolen goods, however, for we are told by Lord Camden in 1765 "No less a person than my Lord Coke denied its legality. 4 Inst. 176.". Entick v. Carrington, 95 Eng. Rep.R. 807, (1765) quoted in Boyd v. United States, 116 U.S. 616 at 628, 6 S. Ct. 524, 29 L.Ed. 746 (1885).

The next great statement of the common law applicable to this area after Coke is Sir Matthew Hale's History of the Pleas of the Crown written sometime between 1660 and his death in 1676. Hale disagrees with Coke concerning the propriety of warrants granting the power to search, and Chapter XVIII of Vol. 2 described in detail his views on such warrants.

First, it is unclear if Hale contemplated a warrant to search apart from an arrest warrant. He does not say directly that a search warrant may issue only as part of an arrest warrant, but he does seem to hold that a warrant to search implies a warrant to arrest, for he says "It ought to command, that the goods found, together with the party in whose custody they are found, be brought before some justice of the peace, to the end that upon further examination of the fact the goods and party, in whose custody they are found, may be disposed, as to law shall appertain.". And further ". . . the very having of the goods carries a sufficient

---

1. This does not mean that silence can never be taken as a refusal of admittance under § 3109. If the authorities are sure that the premises are occupied, for ex-

ample, there might be numerous situations in which silence could reasonably be deemed such a refusal.

ground prima facie of suspicion, that he was the felon that stole them, and may be thereupon justifiably arrested.". Lastly in discussing the execution of such warrants, he gives the following instructions. "If the door be shut, and upon demand it be refused to be opened *by them within,* if the stolen goods be in the house, the officer may break open the door, . . . (emphasis supplied)". The words "by them within" are most crucial, for it shows that Hale contemplated no execution of the warrant when no one was within. Also, the requirements of demand and refusal before forcible entry are the same as those applied by Hale to arrest warrants at 2 Hale, Pleas, supra 90–92.

These requirements were first put foreward in Semayne's Case, 77 Eng. Rep.R. 194 (K.B., reported by Coke 1604). As was pointed out by Judge Prettyman in *Accarino,* supra, 179 F.2d at page 460, this case "which is usually cited as an authority upon this subject, really concerned a writ issued in a civil case, but the court discussed the rights of a sheriff, in cases when the King was a party, to break into a house either to arrest a felon "or to do other execution of the K.'s process".

The relevance of all this is that the demand and refusal concept and language first developed in contemplation of an arrest situation or a situation where there was an actual party on the premises to refuse. There is no possibility of an ex parte execution of an arrest warrant, and there is no indication to be found that execution of search warrants except on occupied premises was either practiced or even contemplated, much less condoned, at common law. Indeed, Hale seems to have been the only commentator who even came close to separating the search warrant from the arrest warrant prior to 1766. Thus, as Judge Prettyman points out in *Accarino,* supra at 461, the previously mentioned mid-18th Century commentator Burn made the following statement concerning forced entry which was appended as a

footnote to the first American Edition of Hale:

"But the breaking an outer door is in general so violent, obnoxious and dangerous a proceeding that it should be adopted only in extreme cases where an immediate arrest is requisite.". 1 Burn, Justice of the Peace and Parish Officer, 87 (6th Ed. 1758).

Hawkins, in his 1716 work, uses Coke's language concerning a "search for felons or stolen goods" under his section on arrests. Although the sentence where he uses Coke's language appears to arrive at Hale's conclusions regarding the propriety of such warrants, this one short comment is Hawkins' only reference to the power to search. Hawkins, Pleas of the Crown, Book 2, Chap. 13. Further, Foster, in his work Crown Law, 1st Ed. 1762, includes extensive observations on the execution of arrests and arrest warrants, with the usual requirements of notification, demand and refusal, at 319 et seq. but does not even mention the power to search either as ancillary to the power to arrest or separate from it.

Lastly, Blackstone, in his great Commentaries, brought out between 1761 and 1769, does not mention a power to search at all.

However, apparently somewhere below the threshold of perception of the commentators, the power to search by official order was being extended by the British Government in the 18th Century, which circumstance was to play a large part in the coming of the American Revolution.

As Mr. Justice Bradley put it in his famous opinion in Boyd v. United States, supra, 116 U.S. at 625, 6 S.Ct. at 529:

"The practice had obtained in the colonies of issuing writs of assistance to the revenue officers, empowering them, in their discretion, to search suspected places for smuggled goods, which James Otis pronounced 'the worst instrument of arbitrary power, the most destructive of English liber-

ty, and the fundamental principles of law, that ever was found in an English law book;' since they placed 'the liberty of every man in the hands of every petty officer.' This was in February, 1761, in Boston, and the famous debate in which it occurred was perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. 'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.' These things, and the events which took place in England immediately following the argument about writs of assistance in Boston, were fresh in the memories of those who achieved our independence and established our form of government. In the period from 1762, when the North Briton was started by John Wilkes, to April, 1766, when the House of Commons passed resolutions condemnatory of general warrants, whether for the seizure of persons or papers, occurred the bitter controversy between the English government and Wilkes, in which the latter appeared as the champion of popular rights, and was, indeed, the pioneer in the contest which resulted in the abolition of some grievous abuses which had gradually crept into the administration of public affairs. Prominent and principal among these was the practice of issuing general warrants by the Secretary of State, for searching private houses for the discovery and seizure of books and papers that might be used to convict their owner of the charge of libel. Certain numbers of the North Briton,

particularly No. 45, had been very bold in denunciation of the government, and were esteemed heinously libelous. By authority of the secretary's warrant Wilkes' house was searched and his papers were indiscriminately seized. For this outrage he sued the perpetrators and obtained a verdict of £1000 against Wood, one of the party who made the search, and £4000 against Lord Halifax, the Secretary of State who issued the warrant. The case, however, which will always be celebrated as being the occasion of Lord Camden's memorable discussion of the subject, was that of Entick v. Carrington and Three Other King's Messengers. . . . ".[2]

The decision in Entick v. Carrington would not be expected to throw light on our present subject, as it dealt with a warrant under which which Entick was arrested at the house to be searched, and was present during the search. However, the face of the warrant was silent as to the method of execution, concerning which Lord Camden wrote:

"The warrant in our case was an execution in the first instance, without any previous summons, examination, hearing the Plaintiff, or proof that he was the author of the supposed libels; a power claimed by no other magistrate whatever (Scroggs C. J. always excepted); it was left to the discretion of these defendants to execute the warrant in the absence or presence of the plaintiff, when he might have no witness present to see what they did; for they were to seize all papers, bank bills, or any other valuable papers they might take away if they were so disposed; there might be nobody to detect them.".

Entick v. Carrington, supra, at 817.

2. The dearth of cases attacking the general warrants which grew up in the first half of the 18th Century is surprising, but it must be rememberd that illegality of seizure was not a ground to challenge competent evidence in a criminal trial at the time and as Lord Camden observed in Entick, "It must have been the guilt or poverty of those upon whom such warrants have been executed, that deterred or hindered them from contending against the power of a Secretary of State and the Solicitor of the Treasury, or such warrants could never have passed for lawful till this time." 95 Eng.Rep.R. 807 at 818. This might in somewise explain the silence of the commentators on the issues raised by these warrants also.

Thus it appears that not only was it not usual to execute a warrant authorizing a search if no one was on the premises, but Lord Camden viewed it as a violation of the common law to do so. This conclusion is further reinforced by the observation of Mr. Justice Brennan in Ker v. California, 374 U.S. 23, 52, 83 S.Ct. 1623, 1639, 10 L.Ed.2d 726 (1963), regarding the general warrants of the Colonial period:

"Service of the general warrants and writs of assistance was usually preceded at least by some form of notice or demand for admission.".

And in further clarification of the great weight to be accorded Entick v. Carrington, both as a statement of the common law and as an authority for the interpretation of the Fourth Amendment we quote Mr. Justice Bradley as follows:

"Lord Camden pronounced the judgment of the court in Michaelmas Term, 1765, and the law as expounded by him has been regarded as settled from that time to this, and his great judgment on that occasion is considered as one of the landmarks of English liberty. It was welcomed and applauded by the lovers of liberty in the colonies as well as in the mother country. It is regarded as one of the permanent monuments of the British Constitution, and is quoted as such by the English authorities on that subject down to the present time."

"As every American statesman, during our revolutionary and formative period as a nation, was undoubtedly familiar with this monument of English freedom, and considered it as the true and ultimate expression of constitutional law, it may be confidently asserted that its propositions were in the minds of those who framed the Fourth Amendment to the Constitution, and were considered as sufficiently explanatory of what was meant by unreasonable searches and seizures. We think, therefore, it is pertinent to the present subject of discussion to quote somewhat largely from this cele-

brated judgment.". *Boyd,* supra 116 U.S. at 626, 6 S.Ct. at 530.

The inevitable conclusion which we must reach from all of the above is that, as already stated, 18 U.S.C. § 3109, as a codification of the common law, does not apply to entries in the execution of a search warrant made with the knowledge that no one is home, and further that the principles of the common law in the minds of the framers when the Fourth Amendment to the Constitution was drafted renders such a procedure seriously suspect Constitutionally.

 It is true that we are not absolutely bound to interpret the Fourth Amendment to mean exactly the same thing as the common law at the time of its enactment. In the words of Mr. Justice Marshall "we must never forget, that it is a Constitution which we are expounding.". McCulloch v. Maryland, 4 Wheat. 316, 407, 4 L.Ed. 579 (1819). The Fourth Amendment must be applied in the light of modern experience, which may lead us to conclude that some practices deemed reasonable in 1789 are not reasonable today, and vice versa. But the core values to be protected remain unchanged, and a court should be extremely cautious in excluding areas from the protection of the Amendment which the common law would have included. Even if we were dealing with an Act of Congress, we could not defer in the abrogation of a core value embodied in the Bill of Rights, and we must proceed with even greater caution here, where there is no legislative judgment authorizing the questioned activity.

It is true that the common law of the Colonial period, with its heavy emphasis on the prerogatives of real property ownership, would probably have denied the right to enter some empty premises to execute a search warrant, such as warehouses, etc., where modern judgment might not find such entry unreasonable under the particular circumstances of the case. But the most important area of common law concern remains a vital concern today. Entick v. Carrington involved a dwelling, and the

dangers of abuse, were the authorities allowed to break into a home to search it after they had made sure it was empty, have changed little from Lord Camden's time. There is still the possibly unnecessary property damage in the broken lock and door. There is unfortunately still the possibility of pilferage by officers of the law. Most importantly, especially since the invention of the camera, there is the very real possibility of a general search made under the guise of a legitimate one, undetectable because the evidence seized need not be physically carried away. We are better protected against the general search than were the Colonists before the decision in *Entick* (insofar as that decision was followed in the colonies), because of the necessity of probable cause for issuance of the warrant, and specificity in describing what may be seized. The protection of specificity might well prove illusory, however, were it to become common practice to execute warrants when nobody but the authorities was present.

The passage of 18 U.S.C. § 3103a marked the demise of the mere evidence rule. While no one really mourns the passing of the mere evidence rule, it is not as difficult as it formerly was to make out grounds for the issuance of a warrant, and the exact limits of those grounds under the Constitution are yet to be set. More easily obtained warrants coupled with their execution on unoccupied homes might lead to a *de facto* resurrection of the general warrant directed, not at specific property, but at the no-holds-barred incrimination of troublesome persons.[3] And even if none of the evils above described occur, the man returning to his home to find the door hanging on one hinge will al-ways feel that they have all happened. There is a basic violation of our traditional sensibilities in such a secret and ex parte procedure taking place in a man's home, with him left to discover it for himself and imagine what he will about its true purpose and procedure afterwards. Security of the home was foremost in the minds of the Framers. We must remember in this regard that the Fourth Amendment not only speaks of unreasonable searches and seizures, but also of "The right of the people to be secure in their persons, *houses*, papers, and effects . . ." (emphasis supplied). Many if not most of us have in our homes something secret which we wish to remain secret, and which we think will injure or embarrass us if it becomes known. It may not be illegal. Our fears regarding the effects of disclosure may be groundless. But we still have the right not to come home to find our doors hanging open, and the agents of the state come and gone from their search of our home, never knowing for sure where they searched or what they found. A man's home is still more his castle than this.

The Court is mindful of a number of cases decided by American courts which appear to bear on the subject. The sole 19th Century case, Androscoggin R. R. Co. v. Richards, 41 Me. 233 (1856), decided, on what we regard as a misreading of Hale, supra, that a valid warrant protected an officer from an action in trespass when he broke into an unoccupied railroad depot to serve it.[4] But even at that, the opinion specifically excepts entry into homes under such conditions from the scope of its ruling. The 20th Century cases, some eight in number are not compelling.[5]

---

3. The dangers of such a practice become very concrete indeed when it is observed that even in this case, though the great bulk of the items seized were reasonably related to the description in the warrant, the agents could not resist the temptation to take defendant's personal telephone book, which was neither described in the warrant nor reasonably related to it.

4. As set out above, it appears that Hale never contemplated such a situation. See the Court's discussion of *Hale* earlier in this Opinion.

5. Jones v. State, 4 Ala.App. 159, 58 So. 1011 (1912) ; United States v. Camarota et al., 287 F. 388 (S.D.Cal., 1922) ; Thigpen v. State, 299 P. 230 (Okl.Cr.Ct.

The first such case, Jones v. State, 4 Ala.App. 159, 58 So. 1011 (1912), decided the issue in one sentence, and none expended more than a very few paragraphs. More importantly, none faced squarely the Constitutional problems of such an entry. The entire jurisprudence of the 20th Century on the subject can be reduced to two propositions: First, that a person should not be able to prevent the execution of a search warrant by exiting surreptitiously as the authorities arrive; and second, that a person should not be able to defeat the execution of a search warrant by staying away from the premises to be searched. Whatever validity these propositions might have in other circumstances, we find them unpersuasive on the facts before the Court. To claim that a person will be able to defeat the process of the court by sneaking out is tenuous, since persons are not usually expecting the police, and most search parties have enough persons in them to cover all exits, which seems in the experience of the Court to be standard police practice. Second, in the case of a dwelling, the claim that a person can defeat the process of the Court by staying away also seems tenuous, especially where a person does not know he is under investigation.

These considerations hardly outweigh the serious Constitutional problems set out above, and since we are not bound by these decisions, we note their existence but decline to follow them insofar as they would apply.

██ We note with satisfaction that the very fact that there are only a small number of cases on this question seems to indicate that searches of unoccupied homes never have been the rule in American jurisdictions, and are not today. Our decision in this case will not turn established police procedure upside down. However, the Constitution is not only to protect us from widespread abuses of the past and present, but those that might become widespread in the future also. We do not believe that there was any mischievous intent on the part of the officers who served the warrant in the present case, but Constitutional protections cannot be waived by the good intentions of the authorities. We cannot see how we could uphold the procedure in this case without affirming its propriety as standard procedure in all future cases. A man's home should not be forcibly entered in his absence to serve a search warrant, absent some exigent circumstance which it is up to the Government to show, especially in a case such as this where the house was under surveillance and the agents knew before going to the door that no one was home. No such exigent circumstances appear in the record. It appears that the defendant was a regularly employed person of fairly regular habits, and the agents' investigation should have revealed this. Defendant did not know he was under investigation or that a warrant had been issued. If the warrant was not served before night on March 23 there was every reason to expect it could be served the next morning. Further, the Court observes that a special exception to the rule that a day warrant may not be served in the night, allowing service upon the return of the occupant if the home was empty at sundown, makes much more sense in the protection of the values inherent in the Fourth Amendment than does any approval of the entry of a home when it is unoccupied.

██ Nor does the entry of the delicatessen proprietor onto the premises to be searched in response to the sound of

of App.1931) ; Collins v. State, 184 Tenn. 356, 199 S.W.2d 96 (1947) ; Pennington v. State, 302 P.2d 170 (Okl.Ct.Cr.App. 1956) ; People v. Johnson, 231 N.Y.S.2d 689 (Ct.Gen.Sess., N.Y.Co.1962) ; People v. Law, 55 Misc.2d 1075, 287 N.Y.S. 2d 565 (1968) ; United States v. Hawkins, 243 F.Supp. 429 (E.D.Tenn.1965). Two other cases sometimes cited as

bearing on this subject, Goodman v. State, 178 Md. 1, 11 A.2d 635 (S.Ct.Md. 1940) and United States v. Watson, 307 F.Supp. 173 (Dist.Ct. of D.C.1969) are not apposite as they both involved searches of occupied premises, and the statements therein contained, while no more compelling than the statements in the other cases, are dicta.

the breaking door cure the unreasonableness of the manner of entry. This man was not a guest left in charge of Gervato's home in his absence. There is no guarantee that such a person would have any interest in preventing the abuses we have alluded to. If the entry was unreasonable it cannot be afterwards cured by such a fortuitous arrival.

Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), held that the manner of entry into a home may render whatever comes after unreasonable no matter how reasonable it would have been but for the unreasonable entry, and further held that suppression of evidence seized after such an entry was the proper course to be followed. In that opinion the court observed, at 313, 78 S.Ct. at 1197,

"We are duly mindful of the reliance that society must place for achieving law and order upon the enforcing agencies of the criminal law. But insistence on observance by law officers of traditional fair procedural requirements is, from the long point of view, best calculated to contribute to that end. However much in a particular case insistence upon such rules may appear as a technicality that inures to the benefit of a guilty person, the history of criminal law proves that tolerance of short cut methods in law enforcement impairs its enduring effectiveness.".

Later in the same paragraph, the Court speaks regarding § 3109 in language applicable to the present case also:

"Congress, codifying a tradition embedded in Anglo-American law, has declared . . . the reverence of the law for the individual's right of privacy in his house. Every householder, the good and the bad, the guilty and the innocent, is entitled to the protection designed to secure the common interest against unlawful invasion of the house.".

For the reasons set out above, the Court finds that the entry into defend-ant's unoccupied home on March 23, 1971, was unreasonable and unlawful and rendered the search and resulting seizures unreasonable in violation of the Fourth Amendment of the Constitution of the United States, and that therefore all evidence procured as a result of that unlawful entry, search and seizure must be and hereby is rendered inadmissible in any criminal proceeding against the defendant Frank Gervato.

One further issue must be dealt with. On April 2, the defendant went to the Philadelphia Regional Office of the BNDD, accompanied by counsel. He went at the request of the Bureau. While there he made an unsigned statement concerning the fruits of the search. Apparently both defendant and his counsel regarded the statement as exculpatory in the face of what the search had turned up. Defendant now attacks the admissibility of those statements.

■ The test as to whether evidence is the fruit of an illegal search is whether it "has been come at by exploitation of that illegality, or instead by means sufficiently distinguishable to be purged of the primary taint". Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). In the latter regard the connection between the illegality and the evidence may "become so attenuated as to dissipate the taint". Id, at 491, 83 S.Ct. at 419, quoting Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

■ The question is, are these statements the fruit of the illegal search, or were the effects of the search so purged and dissipated that the statements are not properly the result of them. We must conclude that the statements were the fruit of the illegal search on the strength of Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968). The facts in *Harrison* were as follows: The authorities illegally obtained confession from Harrison. At Harrison's first trial, the trial court erroneously admitted the confession, and

Harrison, with advice of counsel and time to reflect, took the stand in an attempt to explain away the confession. The testimony he gave in an attempt to exonerate himself turned out to be damning. Harrison was convicted, but granted a new trial on the basis of the trial court's error in admitting the illegally obtained confession. At the second trial, the confession was kept out but Harrison's testimony at the previous trial was admitted. In holding that this testimony was fruit of the poisonous tree, the Court said "The question is not *whether* the petitioner made a knowing decision to testify, but *why*. If he did so in order to overcome the impact of confessions illegally obtained . . . then his testimony was tainted by the same illegality.". It must be observed that in *Harrison* the defendant also had counsel. The presence of counsel in such a case as the case at bar does not render the statements any less the fruit of the illegal search, especially since even a good lawyer could not be sure that the evidence seized would be ultimately ruled inadmissible. The only thing in all the world that impelled the statements of defendant was the illegally seized evidence.

Perhaps passage of time can purge the undue coercive effects of an illegal arrest, see *Wong Sun,* supra, but it is difficult to see how it would dissipate the coercive effect of illegally seized tangible evidence. For these reasons the defendant's statements at the Philadelphia Regional Office of the Federal Bureau of Narcotics and Dangerous Drugs of April 2, 1971, must also be held inadmissible against him in any criminal proceeding.

### On Motion for Reconsideration

The Government has filed a Motion for Reconsideration by the Court of its order suppressing evidence, raising a number of points. As far as the facts go, the Court is satisfied that the conclusions it reached were both proper and probable. However, some further observations are called for. The Fourth

paragraph of the Government's Motion includes the following statement:

"In addition thereto, the statement of the defendant's witness Mr. Sokol itself indicates that the agents were not sure whether Gervato was at home or not. We believe that the defendant should be bound by the testimony of his own witness.".

The testimony referred to is that from Page 107 of the transcript, where Mr. Sokol testified:

"So I says, 'Why did you have to go through the door?' And I says to him, 'What is going on? Is Gervato home?'

So he says, '*No,* we saw him—we think he run in here, that is why we had to break in fast.'" (emphasis supplied)

It will be noted that Mr. Sokol asked if Gervato was home, to which the Agent replied "No, we saw him . . ." and then said "we think he run in here, that is why we had to break in fast.". This is not necessarily a claim that the agents really thought Gervato was home. It can as easily be taken as a near admission of knowledge of Gervato's absence by the agents, followed by an attempt at excuse which was never even alleged at the hearing. It is not a statement clearly indicating that "the agents were not sure whether Gervato was home or not", and even if they had unequivocally so stated to Mr. Sokol, Mr. Gervato could not possibly be bound to admit the truth of the agent's statement to Sokol simply because Sokol testified that the statements were made.

As to the allegation in Paragraph 5 of the Government's Motion that the principal of the Court's decision in this case would also deny the power of "law enforcement authorities to seize contraband goods where their very existence might be a danger to the community, as explosives", it is for future cases to decide what exigent circumstances are sufficiently pressing to justify a forcible entry of an unoccupied dwelling for the purposes of search and seizure on the particular facts then at issue. In this

case there were no such exigent circumstances.

The Government's other contentions are without merit. The Motion for Reconsideration of Order Suppressing Evidence is denied.