**UNITED STATES of America, Appellant,**

v.

**Frank GERVATO, Appellee.**

**No. 72–1334.**

United States Court of Appeals, Third Circuit.

Argued Nov. 14, 1972.

Decided Jan. 26, 1973.

------◆------

Carl L. Melone, U. S. Atty., James J. Tansey, Criminal Division, Department of Justice, Washington, D. C., for appellant.

Stanford Shmukler, Philadelphia, Pa., Richard P. Abraham, Philadelphia, Pa., of counsel, for appellee.

Before ALDISERT, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

We review in this case the validity of a district court decision that a warrant to search a private dwelling cannot constitutionally be executed in the known absence of the occupant unless exigent circumstances exist. As far as we know, this question has not been decided by either the Supreme Court or any federal court of appeals.

On March 24, 1971, agent Glanz of the Federal Bureau of Narcotics and Dangerous Drugs (BNDD) obtained a warrant authorizing him to search appellee Frank Gervato's apartment in the daytime for Dimethyltryptamine, a controlled dangerous drug, and chemicals and equipment used in its manufacture. About 5:30 p. m., Glanz and two BNDD chemists drove to appellee's apartment which had been under surveillance by BNDD agents since approximately 12:30 p. m. that day. These agents had seen Gervato leave the premises sometime after 1:00 p. m. and not return, and Glanz was so informed by radio when he arrived around 6:00 p. m. Glanz then proceeded to appellee's door, knocked, and announced his official identity and his reason for wanting to enter the apartment. When he received no reply he knocked again and then forced open the door. Once inside the apartment, Glanz and the other agents were met by the owner of the building and two young men, who had entered through a door connecting the apartment with a delicatessen. Glanz showed the owner a copy of the search warrant and agreed to the owner's request to be present while the apartment was searched. The warrant was then executed with 78 items being seized. The agents departed about 9:00 p. m., leaving behind a copy of the search warrant and a list of the items seized. Gervato, who apparently knew nothing about the search, returned home a few minutes later.

On July 15, 1971, a two count indictment was returned charging appellee with illegally manufacturing and possessing lysergic acid amide, in violation of the Federal Food and Drug Act. On November 29, 1971, appellee filed a pretrial motion to suppress the evidence uncovered by the March 24 search. This motion was sustained by the district court on March 1, 1972 on the ground that the known absence of appellee made the search unreasonable and therefore in violation of the Fourth Amendment. United States v. Gervato, 340 F.Supp. 454 (E.D.Pa.1972). Specifically, the district court said that "[a] man's home should not be forcibly entered in his absence to serve a search warrant, absent some exigent circumstance which it is up to the Government to show, especially in a case such as this where the house was under surveillance and the agents knew before going to the door that no one was home." *Id.* at 463. The government has appealed this decision pursuant to 18 U.S.C. § 3731. We reverse because we do not believe that the Fourth Amendment requires the occupant to be present before his home can be searched under a valid search warrant and because we do not think that the present search was unreasonable.

The Supreme Court has examined on many occasions the history and purposes of the Fourth Amendment. *E. g.*, Warden v. Hayden, 387 U.S. 294, 301, 87 S. Ct. 1642, 18 L.Ed.2d 782 (1967); Stan-

ford v. Texas, 379 U.S. 476, 481–485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); Marcus v. Search Warrant, 367 U.S. 717, 724–729, 81 S.Ct. 1708, 6 L.Ed.2d 1178 (1961); Frank v. Maryland, 359 U.S. 360, 363–366, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959); Boyd v. United States, 116 U.S. 616, 624–629, 6 S.Ct. 524, 29 L.Ed. 746 (1874). This history shows that the primary purpose of the Amendment was to put an end to the general warrants and writs of assistance under which officers of the Crown had been empowered to conduct general searches and seizures. James Otis denounced these writs as " 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book' since they placed 'the liberty of every man in the hands of every petty officer.' " The historic occasion of that denunciation, at a famous 1761 debate in Boston, has been characterized as "perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country. 'Then and there,' said John Adams, 'then and there was the first scene of the first act of opposition to the arbitrary claims of Great Britain. Then and there the child Independence was born.' " Boyd v. United States, *supra* at 625, at 529 of 6 S.Ct.

In order to understand the Founding Fathers' perspective on writs of assistance, it is instructive to consider the history of the controversial general warrant in England. As Stanford v. Texas, *supra* at 482–483 of 379 U.S., at 510 of 85 S.Ct. points out:

"What is significant to note is that the history is largely a history of conflict between the Crown and the press. It was in enforcing the laws licensing the publication of literature and, later, in prosecutions for seditious libel that general warrants were systematically used in the sixteenth, seventeenth, and eighteenth centuries. . . . In later years warrants were sometimes more specific in content, but they typically authorized the arrest and search of the premises of all persons connected with the publication of a particular libel, or the arrest and seizure of all the papers of a named person thought to be connected with a libel."

In the Colonies, the hated writs of assistance were also frequently used to search for evidence of crime or of illegally imported goods.

A few years prior to the outbreak of the American Revolution, the use of general warrants to aid in prosecutions for seditious libel was judicially condemned in England in two landmark cases, Wilkes v. Wood, 19 How.St.Tr. 1153 (1763) and Entick v. Carrington, 19 How.St.Tr. 1029 (1765). In the former case, John Wilkes had boldly denounced the English government in issue No. 45 of the North Briton. By authority of a warrant issued by the Secretary of State, Wilkes was carried away, and his house was then searched and his papers indiscriminately seized. Wilkes sued and obtained a verdict of one thousand pounds against one of the perpetrators of the search and four thousand pounds against the Secretary of State. In his opinion, Lord Camden condemned the "general warrant, where no inventory is made of the things thus taken away, and where no offenders' names are specified in the warrant, and therefore a discretionary power given to messengers to search wherever their suspicions may chance to fall." 19 How.St.Tr. at 1167. However, while Lord Camden was obviously distraught at what he viewed as a "ridiculous warrant against the whole English nation," there is no indication that he believed the warrant could not be executed in Wilkes' absence.

In Entick v. Carrington, *supra*, a warrant based on a charge of seditious libel issued for the arrest of Entick, the author of a publication called Monitor or British Freeholder, and for the seizure of all his papers. The King's messengers executing the warrant ransacked Entick's home for four hours and carted away great quantities of books and papers. In an opinion which the Supreme Court has recognized as a wellspring of

the rights now protected by the Fourth Amendment,[1] Lord Camden declared the general warrant for the seizure of papers contrary to the common law, despite its long history. "This power," he said, "so assumed by the secretary of state is an execution upon all the party's papers, in the first instance. His house is rifled; his most valuable secrets are taken out of his possession, before the paper for which he is charged is found to be criminal by any competent jurisdiction, and before he is convicted either of writing, publishing, or being concerned in the paper." 19 How.St.Tr. at 1064.

The district court in the present case placed great emphasis on one passage in *Entick* from which it concluded that the common law prohibited the execution of a search warrant if no one was on the premises.[2] Upon examination of that passage in the context of the entire opinion, however, we do not believe that such a conclusion is justified. Lord Camden's concern in both *Wilkes* and *Entick* was with the unrestricted discretion of those who executed the warrants and not with the presence or absence of either plaintiff. Consequently, after reviewing these two cases along with the other authorities cited by the district court, we do not think that the common law prohibited searches in the absence of the occupant at the time the Fourth Amendment was adopted.

*Entick* and *Wilkes*, when considered with the Supreme Court cases already discussed, show that the search and seizure provision of the Fourth Amendment was primarily designed to protect against warrantless searches and seizures and those conducted under an indiscriminate general authority. There is no indication that the Founding Fathers were also concerned that the power to search should be dependent on the presence of the occupant.

In light of this history, it is significant to note that neither the Supreme Court nor any court of appeals has ever hinted or suggested, despite many opportunities to do so, that a search warrant should be executed only in the presence of the possessor or occupant of the property searched.[3] *See, e. g.*, Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L. Ed.2d 828 (1961); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Spinelli v. United States, 382 F.2d 871 (8th Cir. 1971), rev'd on other grounds, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); United States v. Ravich, 421 F.2d 1196 (2d Cir. 1970), cert. denied, 400 U.S. 834, 91 S. Ct. 69, 27 L.Ed.2d 66 (1970); United States v. Maroney, 339 F.2d 710 (3d Cir. 1965).

In addition, Rule 41, F.R.Cr.P. 18 U. S.C., does not provide, among its manda-

1. *See* Stanford v. Texas, *supra* at 484 of 379 U.S., 85 S.Ct. 506, and Boyd v. United States, *supra* at 626–627 of 116 U.S., 6 S.Ct. 524.

2. The district court refers to a passage in a different version of Entick v. Carrington, 95 Eng.Rep.R. 807, 817 (1765). This passage reads:

"The warrant in our case was an execution in the first instance, without any previous summons, examination, hearing the plaintiff, or proof that he was the author of the supposed libels; a power claimed by no other magistrate whatever (Scroggs C. J. always excepted); it was left to the discretion of these defendants to execute the warrant in the absence or presence of the plain-

tiff, when he might have no witness present to see what they did; for they were to seize all papers, bank bills, or any other valuable papers they might take away if they were so disposed; there might be nobody to detect them."

3. If anything, the Supreme Court has indicated in dictum that a search is permissible in the absence of the occupant. Alderman v. United States, 394 U.S. 165, 178, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). *See also* Blakey, Aspects of the Evidence Gathering Process in Organized Crime Cases: A Preliminary Analysis, in The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Organized Crime 80, 97 (1967).

tory requirements, that a search warrant should be executed only in the presence of the occupant. Since this Rule was promulgated by the Supreme Court, it appears likely that the Court did not consider the presence of the occupant to be a common law or constitutional requirement. Rule 41(d) provides in part that an inventory "shall be made in the presence of the applicant for the warrant and the person from whose possession or premises the property was taken, *if they are present. . . ."* (Emphasis added). This "if" phrase also suggests that the Court did not believe that the Fourth Amendment requires presence.[4] *Cf.* United States v. Scolnick, 392 F.2d 320 (3d Cir. 1968), cert. denied, 392 U.S. 931, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968).

■ Parenthetically, we agree with the district court and appellee that 18 U.S.C. § 3109[5] has no bearing on the present case, either as an authorization justifying agent Glanz's conduct or as an authority forbidding that conduct. United States v. Gervato, *supra* at 457, of 340 F.Supp. However, when the search is authorized as it was here, then the procedural requirements of § 3109, which are directed at avoiding breaches of the peace,[6] must be followed. Those requirements were followed in this case.

■ Having decided that the Fourth Amendment does not prohibit *per se* searches conducted in the absence of the occupant, we now hold that the present search was reasonable under the circumstances. In order to obtain a search warrant today, the government must show that it has probable cause for its issuance, and the warrant must identify the property to be seized and name or describe the person or place to be searched. Rule 41(c), F.R.Cr.P. 18 U.S.C. This provides an individual with considerably more protection than did the general warrant of the sixteenth, seventeenth and eighteenth centuries which permitted unrestricted searches and seizures. Rule 41(d) also requires that a person be given an inventory of goods seized or that it be left at the place where the property was taken, something which was not necessary with the general warrant.

---

4. This position is supported by the American Law Institute Official Draft No. 1, Model Code of Pre-Arraignment Procedure (July 15, 1972), Part II, Search and Seizure, §§ 220.3(4) and (6), which provide:

    "(4) *Service of Warrant.* In the course of any search or seizure pursuant to the warrant, the executing officer shall read and give a copy of the warrant to the person to be searched, or the person in apparent control of the premises to be searched, as the case may be. The copy shall be read and furnished before undertaking the search or seizure unless the officer has reasonable cause to believe that such action would endanger the successful execution of the warrant with all practicable safety, in which case it shall be read and furnished as soon as is practicable. *If the premises are unoccupied by anyone in apparent and responsible control, the officer shall leave a copy of the warrant suitably affixed to the premises.* (Emphasis added.)

    "(6) *List of Things Seized.* Upon completion of the search, the officer shall make a list of the things seized, and shall deliver a receipt embodying the list to the person from whose possession they are taken, or the person in apparent control of the premises from which they are taken, as the case may be. The list shall be prepared in the presence of the person to whom the receipt is to be delivered. *If the premises are unoccupied by anyone in apparent and responsible control, the executing officer shall, if practicable, secure the presence of one or more apparently credible persons to witness the preparation of the list, and shall leave the receipt suitably affixed to the premises.*" (Emphasis added.)

5. 18 U.S.C. § 3109 provides:
    "The officer may break open any outer or inner door or window of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

6. *See* Miller v. United States, 357 U.S. 301, 313, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958); *see also* Wong Sun v. United States, 371 U.S. 474, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Despite this, the district court indicated that a search warrant executed in the absence of the occupant constitutes an unreasonable search because there exists the possibility of a general search and "pilferage by officers of the law." It is, of course, true that either or both of these abuses could occur. However, we agree with the government that the requirement for judicial supervision prior to issuance provides adequate protection against the general warrant. Rule 41(e), F.R.Cr.P. 18 U.S.C. With respect to pilferage, Rule 41(c) and 18 U. S.C. § 3105 restrict the execution of search warrants to certain civil officers of the United States.[7] In addition, Rule 41(d) mandates that an inventory be made of items seized, and it requires that this inventory be made in the presence of the person from whose possession of premises the property was taken *or* in the presence of at least one credible person other than the applicant for the warrant.

In addition to the above considerations, it is unlikely that the presence of the occupant at the beginning of a search would significantly reduce the possibility of pilferage or a general search. Frequently he would be placed under arrest, handcuffed, and sometimes removed from the premises before the search is completed. Even if this does not happen, when the executing party involves several officers, a number of areas can be searched at once making it impossible for the occupant to observe everything that happens. The district court has not suggested that these procedures are impermissible, but only states that the occupant must be present before a search can begin. This requirement will not avoid the possibility of pilferage or a general search, however, since in most instances these abuses could just as easily occur whether or not the occupant is present when the search commences. Consequently, for this reason as well as for those stated in the above paragraph, we reject the district court's finding that the execution of a search warrant in the absence of the occupant significantly increases the likelihood of a general search or pilferage and is therefore unreasonable.

The district court also indicated that a search begun in the absence of the occupant is unreasonable because of the possibility of unnecessary property damage in a broken lock and door. However, we do not believe that this alone is a sufficient detriment to make a search unreasonable where a warrant based on probable cause has been obtained.

There is also a second issue in this case which must be discussed. A few days after the search, a BNDD agent told appellee's attorney that he would like to interview appellee. The attorney agreed, and on April 2, 1971, appellee went to the Philadelphia Regional Office with his attorney. While there, he made an unsigned statement which the district court ordered suppressed as the fruit of an illegal search. Since we have found that the search in this case was constitutional, however, there is no reason to suppress this statement.

For the foregoing reasons, the order of the district court sustaining the motion to suppress evidence will be vacated and the cause remanded for further consideration.

7. Rule 41(c) provides in pertinent part:
   "The warrant shall be directed to a civil officer of the United States authorized to enforce or assist in enforcing any law thereof or to a person so authorized by the President of the United States."
   18 U.S.C. § 3105 provides:

"A search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution."