**UNITED STATES of America,**
**Plaintiff-Appellant,**

**v.**

**Salvatore FINAZZO, Dominic J. Licavoli,**
**Defendants-Appellees.**

**No. 77–5186.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 16, 1977.

Decided Aug. 28, 1978.

James K. Robinson, U. S. Atty., Detroit, Mich., John L. Newcomer, Sp. Atty., Detroit

Strike Force, U. S. Dept. of Justice, Detroit, Mich., for plaintiff-appellant.

Ivan E. Barris, Michael H. Golob, Barris & Crehan, Detroit, Mich., for Finazzo.

S. Allen Early, Jr., Detroit, Mich., for Licavoli.

Before CELEBREZZE and MERRITT, Circuit Judges, and CECIL, Senior Circuit Judge.

MERRITT, Circuit Judge.

Under the 1968 eavesdropping statute,[1] the FBI secured an interception order from a federal judge, and on the basis of incriminating evidence obtained from overhearing the defendant Finazzo's conversations at his office, the government charged him with a federal offense. The government appeals from a decision by Judge Damon Keith suppressing all the evidence obtained from electronic eavesdropping devices which FBI agents secretly installed by breaking into Finazzo's offices. We affirm the suppression order. We hold that judges do not have the power under the 1968 wiretapping statute to authorize breaking and entering in order to install electronic devices; and, in the absence of specific statutory authority, they do not have the power under the Fourth Amendment. We also hold that federal law enforcement agents do not have independent statutory or constitutional authority to engage in break-ins to install eavesdropping devices. No statute gives federal judges the power to authorize break-ins to plant eavesdrops; the judiciary does not have inherent power to delegate this authority to police officers; and police officers do not have that authority independently.

1. 18 U.S.C. §§ 2510–2520 (1976).

2. 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

3. *Id.* at 470, 48 S.Ct. at 575.

4. *Id.* at 485, 48 S.Ct. at 575.

## I. STATEMENT OF THE CASE

### A. The Background of the 1968 Eavesdropping Statute

In 1928 the Supreme Court decided *Olmstead v. United States*,[2] holding that the Fourth Amendment does not apply to wiretapping and bugging when wires are tapped or conversations are intercepted from outside the home or office. Relying on property concepts, the Supreme Court, in an opinion by Chief Justice Taft, held that the Fourth Amendment does not come into play unless there is an "actual physical invasion" of the premises. The separate dissents by Holmes and Brandeis are now considered landmarks. Holmes, calling wiretapping a "dirty business," said that he preferred "that some criminals should escape than that the government should play an ignoble part" by ignoring the Fourth Amendment.[3] The case prompted Brandeis to remark that government is "the potent, the omnipresent teacher," and "breeds contempt for law" and "invites anarchy" when it becomes the "law breaker."[4] The Fourth Amendment, according to Brandeis, protects privacy and therefore applies to eavesdropping whether or not there is a physical invasion of the premises. After the *Olmstead* case, Congress enacted the Communications Act of 1934 in which it forbade all surreptitious interception and disclosure of telephone and other wire communications,[5] but the Justice Department adopted the position that this statute allowed wiretapping so long as the information was not disclosed to persons outside the executive branch or used in judicial proceedings.

Forty years later in two cases, *Berger v. New York* and *Katz v. United States*[6]—one reviewing an eavesdropping statute adopted by the state of New York and the other reviewing FBI bugging of a public tele-

5. Pub.L. No. 73–652, § 605, 48 Stat. 1103 (1934). This section was amended by § 803 of the Electronic Surveillance Act of 1968, Pub.L. 90–351, Title III, § 803, 82 Stat. 223, and as amended is found at 47 U.S.C. § 605 (1970).

6. 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967); 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

phone booth—the Supreme Court finally reversed its position in *Olmstead.* The Court held that the Fourth Amendment protects privacy as well as property interests and that even in the absence of physical intrusion, electronic eavesdropping is sufficiently like a search to require the government to satisfy Fourth Amendment standards of probable cause and limitation of scope of the search.

## B. The Structure of the 1968 Eavesdropping Statute

A year later Congress passed a new statute allowing, but carefully circumscribing, wiretapping and electronic surveillance by state, local and federal police officers. Congress attempted to satisfy the Fourth Amendment search warrant requirements of probable cause and limitation of scope in three ways:

1. It required federal law enforcement officers who apply for a federal judicial order authorizing interception of private conversations to furnish the federal judge with the following information: (a) a statement of the facts relied upon to justify a belief that an offense is being committed, the identity of the person involved and a description of the place and facilities at which the communication is to be intercepted; (b) the investigative reasons electronic surveillance is needed, including a statement of other investigative procedures that have been tried and have failed or that appear unlikely to succeed; (c) a statement of the period of time for which the interception is to continue.[7]

2. Before issuing an intercept order under the Act, the federal judge must find: (a) there is probable cause to believe that a person is committing or has committed a particular offense covered by the Act; (b) there is probable cause to believe that a particular communication concerning the offense will be obtained through the interception; (c) other investigative procedures have failed or appear unlikely to succeed; (d) there is probable cause to believe that the facilities or place from which the communication is to be intercepted are being used in connection with the commission of the offense.[8]

3. Finally, the interception order itself must include the following: (a) the identity of the person whose communication is being intercepted; (b) a description of the place and facilities at which the communication is to be intercepted; (c) a particular description of the kind of communication sought to be intercepted; (d) the identity of the government agency authorized to intercept the communication; (e) the time period during which the interception is to continue.[9]

This carefully constructed statute is curiously silent, however, on the method for installing eavesdropping devices. The statutory scheme is elaborate, carefully circumscribing powers of judicial and police officers, but it does not mention or authorize secret entry or break-ins in the execution of warrants.

Senator Morse, an opponent, and Senator Tydings, a supporter, said on the Senate floor that break-ins might be necessary to install eavesdrops.[10] But if Congress intended to allow such conduct under an intercept order, the lawmakers did not believe that they needed to write it into the statute. The Committee reports do not mention or sanction breaking and entering, and neither the House nor the Senate publicly confronted, debated or deliberated about the question.

## C. Facts Relating to the Intercept Order and the Break-in in the Instant Case

Based in part on conversations overheard in Finazzo's office, defendants Finazzo and Licavoli, and three others were indicted in April, 1975, for bribery of a federal public

7.  18 U.S.C. § 2518(1).

8.  18 U.S.C. § 2518(3).

9.  18 U.S.C. § 2518(4).

10.  114 Cong.Rec. 11598, 12989 (1968).

official.[11] The supervisor of the surety guarantee program of the Small Business Administration in Washington allegedly received an $18,000 bribe from a Cleveland construction company. In exchange for the bribe, the federal official arranged a Small Business Administration guarantee or surety bond which the company needed for a $3 million construction project. When the builders later failed to pay the bribe, the federal official hired Finazzo and Licavoli to collect it.

Federal agents installed the eavesdropping devices in Finazzo's offices at AAA Store Fixtures, Inc., in Detroit, pursuant to a warrant issued by the District Court in accordance with the requirements of the 1968 Act. The FBI planted the listening devices as a part of an investigation of loan sharking and apparently learned of the bribe and the collection efforts accidentally by listening to conversations among the defendants. The District Court granted the motion of Finazzo and Licavoli to suppress all evidence obtained through these hidden transmitters on the grounds that federal agents who executed the warrant were not authorized surreptitiously to break and enter Finazzo's offices to install the transmitters.

Federal agents first applied in September, 1975, for court authorization to intercept telephone and oral conversations at Finazzo's offices. The application and accompanying affidavit specified which telephone lines would be intercepted and described particularly the location of several offices on the premises where the agents believed that Finazzo and others operated a loan shark business. An attached diagram of the building showed the exact positions of the telephone which would be tapped and the locations in the warehouse where hidden microphones would be placed to broadcast the suspects' conversations. Although installation of the transmitting equipment presumably required the agents secretly to enter the building, the government's eavesdropping application did not expressly describe how installation would be accom-

plished. The government contends that the District Judge understood that installation of the electronic devices would require forcible entry and implicitly authorized this procedure when he issued the warrant permitting electronic surveillance.

AAA Store Fixtures, Inc., located in an industrial area of Detroit, is a commercial building consisting primarily of a warehouse and offices. Federal agents who had observed the building for several months decided that "the only satisfactory way" to install eavesdropping devices was to break into the offices at night when the building was vacant and unguarded. Department of Justice attorneys advised that the court order implicitly authorized the agents to execute the warrant "by forcible and surreptitious means if this was the only reasonable way to install the microphones":

> Therefore [according to the findings of the District Court], at approximately 1:00 a. m. on October 1, 1973, entry was made into the premises through an unlocked window by one F.B.I. agent. He then opened a locked door from the inside and admitted two other agents onto the premises. These agents installed three microphones in approximately three and one half hours, after which they left by the same manner in which they had arrived. The agents did not undertake a search or other intrusion on the premises while they installed the microphones.

In December, 1975, two months later, the agents entered the building again to remove the microphones. The evidence obtained is highly incriminating and demonstrates the effectiveness of electronic eavesdropping as an investigatory weapon.

## II. BREAK–INS NOT AUTHORIZED BY EAVESDROPPING STATUTE

■ We must begin with the precise words of the statute in determining whether Congress legalized break-ins. In proposing and adopting electronic eavesdropping legislation, Congress knew that it was entering a politically and constitutionally sen-

11. The indictment alleged violations of 18 U.S.C. §§ 201, 2, and 1952.

sitive and controversial area. Its purpose was to give law enforcement a new, effective method of combating crime while limiting as far as possible government infringement on individual liberty and privacy. Congress set out in detail the steps to be followed when the government proposes to engage in wiretapping and eavesdropping and the standards and safeguards to be followed by courts in ruling on government requests for authority to engage in such conduct.

It simply does not make sense to imply Congressional authority for official break-ins when not a single line or word of the statute even mentions the possibility, much less limits or defines the scope of the power or describes the circumstances under which such conduct, normally unlawful, may take place. As the dissents of Holmes and Brandeis in *Olmstead* suggest, this is a serious, if not a "dirty," business; and we do not believe we should imply the power to break in under the statute, as the government argues, when Congress has not confronted and debated the issue and expressed such an intention clearly.

We acknowledge that the presuppositions of our culture shape our thinking on this question. Privacy is destroyed when monitored. Friendship is frustrated, intimacy is undermined and mutual trust may become dangerous when our confidences are permanently recorded or publicly disclosed. The novels of Kafka and George Orwell evoke some of the same fears and concerns we feel when we contemplate the possibility that wholesale eavesdropping and wiretapping by federal and local police could spread and become customary.

Privacy plays the part in close relationships that publicity, its opposite, plays in public affairs. It is the purifying agent.

The legal principles which protect privacy do not apply to the lonely man on a desert island. They apply to man in a social context and provide the rational "context for relationships which we would hardly be human if we had to do without—the relationships of love, friendship and trust." [12]

Breaking and entering similarly affects these privacy interests, but it also affects the property and personal security interests of the property owner and those who share his roof. It is one thing to overhear words; it is another secretly to break into a house or office, no matter what the purpose. Eavesdropping compromises personal privacy and intimate relations with others. Breaking and entering threatens property and personal security, and creates additional risks of injury, confrontation, anger and violence. Therefore, we have laws against burglary and trespass.

All these interests are sometimes confused and lumped together by comparing eavesdropping with a policeman hiding in the closet. But as the analogy itself illustrates, there are manifest distinctions between the two kinds of intrusion and the interests they threaten. The statute permits eavesdropping by remote control. It does not also authorize by implication a police officer to hide in a closet in order to overhear conversations.

In some circumstances, the installation of an electronic bug may not be possible without a forcible breaking and entering of the suspect's premises,[13] but that does not imply that the power to break and enter is subsumed in the warrant to seize the words. The breaking and entering aggravates the search, and it intrudes upon property and privacy interests not weighed in the statutory scheme, interests which have indepen-

12. Fried, *An Anatomy of Values* 140, 142 (1970). See also Westin, *Privacy and Freedom* 8–23, 52–65, 330–65 (1967).

13. Such instances are rare, however. Telephone taps apparently account for most instances of electronic surveillance, and this can be accomplished in most circumstances by placing a tap on the line outside the premises of the suspect. According to the final report of the National Commission for Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance, only 26 out of some 1,220 electronic surveillance orders executed between 1968 and 1973 involved a trespassory intrusion. *National Wiretap Commission, Electronic Surveillance* 15 (1967), cited in *United States v. Ford*, 180 U.S.App.D.C. 1, 49, 553 F.2d 146, 194 n. 12 (1977).

dent social value unrelated to confidential speech. We are not inclined to give the government the right by implication to intrude upon these interests by conducting official break-ins, especially when the purpose is secretly to monitor and record private conversations, a dangerous power otherwise carefully limited and defined by statute.

There is one further important consideration. The federal eavesdrop statute is an enabling act for state and local judges and police as well as federal officials. If we should read the statute to imply such a power in the hands of federal officers, the statutory scheme would also require us to imply such a power in the hands of state and local officers throughout the country because the statute permits eavesdropping by them under the same standards once the state has passed "a statute . . . authorizing interceptions of wire or oral communications." [14] Already, federal eavesdrop orders constitute only a small percentage of the total number of eavesdrop orders issued each year. As of the end of 1977, twenty-three states had enacted wiretapping and eavesdropping legislation, and state courts in 1977 issued 524 surveillance orders as compared to only 77 orders issued to federal officers. The majority of the taps and eavesdrops were located in single family homes or apartments.[15] Orwell's image of *1984* is no longer fiction if we should hold that hundreds of police officers across the country in every town and village have the power to break into homes and offices to plant electronic monitoring devices if they can obtain permission from a local magistrate in a secret hearing.

## III. THE POWER OF FEDERAL JUDGES UNDER THE FOURTH AMENDMENT TO AUTHORIZE BREAK-INS

■ The conclusion that the statute itself does not authorize break-ins does not end the matter, however. The government also argues that federal judges have inherent or common law power under the Fourth Amendment, independent of any statutory authority, to permit break-ins in the execution of an otherwise valid eavesdrop warrant. In the alternative, the government argues that law enforcement agents—given the statute authorizing electronic eavesdropping—have independent authority under the Fourth Amendment to break and enter in the execution of an eavesdrop warrant, even in the absence of advance clearance from a judge. We will examine these two arguments next.

Although the eavesdrop warrant in question here does not specifically mention breaking and entering, the government points out that the District Judge was aware at the time he issued the intercept order that a secret, forcible entry into Finazzo's office would be necessary to install the transmitter. We must address this issue because the government presses the argument that implied judicial approval of the agents' actions is sufficient under the Fourth Amendment. The argument raises for our review a set of interesting and fundamental questions about the power of federal judges to issue search warrants: Where does the power come from? Is it wholly statutory? Or is it a judge-made doctrine emanating from custom under the common law and incorporated in the Fourth Amendment? Is there a judicial power to authorize forcible entry in the execution of a search warrant and does such a power emanate from the same source as the power to issue search warrants?

*Entick v. Carrington and Three Other King's Messengers,*[16] the celebrated English search and seizure case decided by the Court of Common Pleas approximately twenty years prior to the adoption of the Fourth Amendment, established the principle that the power of a judicial officer to

14. 18 U.S.C. § 2510(7), (9)(b).

15. *Report of Applications for Orders Authorizing or Approving the Interception of Wire or Oral Communications* III, XIV (1978), prepared by the Administrative Office of the United States Courts pursuant to 18 U.S.C. § 2519.

16. 19 Howell's State Trials 1029 (1765).

issue a search warrant is wholly statutory, except in the case of a search for stolen goods. The reasoning of *Entick v. Carrington* was adopted in the landmark American Fourth Amendment case of *Boyd v. United States* decided by the Supreme Court in 1886.[17] According to Justice Bradley in the *Boyd* case, the original meaning and purpose of the Fourth Amendment is to be found in *Entick v. Carrington*, which condemns search and seizure of private papers under general warrants unauthorized by Parliament. In *Boyd*, Justice Bradley says of the *Entick* case (116 U.S. at 626–27, 6 S.Ct. at 530):

> As every American statesman, during our revolutionary and formative period as a nation, was undoubtedly familiar with this monument of English freedom, and considered it as the true and ultimate expression of constitutional law, it may be confidently asserted that its propositions were in the minds of those who framed the Fourth Amendment to the Constitution, and were considered as sufficiently explanatory of what was meant by unreasonable searches and seizures.

In one passage in the *Entick* case, quoted with approval by the Supreme Court in *Boyd*, Lord Camden addresses the question of the origin of the magistrate's power to issue search warrants. He concludes that its origin is wholly statutory except for "the known case of search and seizure for stolen goods:"

> Where is the written law that gives any magistrate such a power [to issue the search warrant in this case]? I can safely answer, there is none; and, therefore, it is too much for us, without such [statutory] authority to pronounce a practice legal which would be subversive of all the comforts of society.

. . . .

The case of searching for stolen goods crept into the [common] law by imperceptible practice. No less a person than my Lord Coke denied its legality, 4 Inst. 176; and, therefore . . . we have no right, without an act of Parliament, to adopt a new practice in criminal law, which was never yet allowed from all antiquity. [19 Howell State Trials at *1029*, quoted in *Boyd*, 116 U.S. at 628, 6 S.Ct. 524.]

Lord Camden then goes on to criticize the Star Chamber Judges who issued search warrants without parliamentary authority and thereby "usurped a general superintendence . . . and exercised a legislative power over all matters relating to the subject." [18]

The early American state cases adopted Lord Camden's view. They disavowed judicial power to issue search warrants in the absence of an enabling act. Chief Judge Parker of the Supreme Judicial Court of Massachusetts wrote in 1816 that "the dwelling house of another cannot be lawfully forced, unless for purposes especially provided by law," meaning positive or statutory "law." [19] The same court observed thirty years later in *Commonwealth v. Dana*: "That the right to search for and seize private papers is unknown to the common law is most conclusively shown by the able opinion of Lord Camden in the case of *Entick v. Carrington*." [20] Judge Cooley's nineteenth century *Treatise on Constitutional Limitations* lays it down as a general principle that search warrants "are only to be granted in the cases expressly authorized by law." [21] Later state cases then adopted a rule of strict construction of search warrant statutes. Their verbal formulation of the rule was that the "use of [search warrants] may not be extended by construction to any case not clearly covered by the statute." [22]

---

**17.** 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746.

**18.** 19 Howell's State Trials at 1069.

**19.** *Sandford v. Nichols*, 13 Mass. 286, 289 (1816).

**20.** 43 Mass. 329, 334 (1845).

**21.** Cooley, *A Treatise on Constitutional Limitations* 618 (8th Ed. 1927).

**22.** *State ex rel. Streit v. Justice Court*, 45 Mont. 375, 382, 123 P. 405 (1912). Accord, *Robinson v. Richardson*, 79 Mass. (13 Gray) 454, 456–457 (1859); *State v. Certain Contraceptive Materials*, 126 Conn. 428, 11 A.2d 863 (1940); *Com-*

Our conclusion that federal courts do not have an inherent power to issue search warrants in the absence of a statute is, therefore, supported by the English common law as reflected in *Entick v. Carrington*, whose principles were received and adopted by the courts of the states and read into the Fourth Amendment by the Supreme Court in the *Boyd* case.

Our opinion is also supported by the early adoption of a specific precept concerning the relation of federal law to the common law. For more than a decade in the early days of the Republic, the Jeffersonians and the Federalists engaged in a heated political debate about whether the federal courts possessed a common law, non-statutory jurisdiction over crimes, in addition to their criminal jurisdiction as defined by statute.[23] The Jeffersonians finally won the contest in a series of important cases which answered the question in the negative. In 1812, in *United States v. Hudson & Goodwin*, the Supreme Court asked the following question:

> The only question which this case presents is, whether the circuit courts of the United States can exercise a common-law jurisdiction in criminal cases. We state it thus broadly, because a decision [in this case] . . . will apply to every case in which jurisdiction is not vested in those Courts by statute.

The Court in an opinion by Justice Johnson answered this question in the negative:

> Although this question is brought up now for the first time to be decided by this court, we consider it as having been long since settled in public opinion. In no

other case for many years has this jurisdiction been asserted; and the general acquiescence of legal men shows the prevalence of opinion in favor of the negative of the proposition.[24]

*Ex parte Bollman*, decided five years earlier, had foreshadowed this result. There, Chief Justice Marshall said that under Article III of the Constitution federal courts lack common law criminal jurisdiction and, therefore, do not have inherent power to issue writs of habeas corpus:

> [T]his court deems it proper to declare, that it disclaim all jurisdiction not given by the Constitution, or by the laws of the United States.

> Courts which originate in the common law possess a jurisdiction which must be regulated by the common law, until some statutes shall change their established principles; but courts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction . . . [F]or the meaning of the term *habeas corpus*, resort may unquestionably be had to the common law; *but the power* to award the writ by any of the courts of the United States, *must be given by written law.* [Emphasis added.][25]

We believe, therefore, that federal judicial officers do not possess an inherent power to issue search warrants or inherent power in the absence of statute to authorize law enforcement officers to engage in break-ins in the execution of search warrants.[26] Any such power, according to Lord Camden's interpretation of the common law and Chief Justice Marshall's interpretation of the

---

monwealth v. Watts, 84 Ky. 537, 542, 2 S.W. 123 (1886); 47 Am.Jur. 511 (1943) (The "availability" of search warrants "may not be extended by construction to any case not covered by statute."); 9 Halsbury, *The Laws of England* § 625 n. (e) (1976).

**23.** See Goebel, *History of Supreme Court of United States: Antecedents and Beginnings to 1801* pp. 623–57 (1971).

**24.** 11 U.S. (7 Cranch) 31, 32, 3 L.Ed. 259 (1812). See the Bator, Mishkin, Shapiro, Wechsler edition of Hart & Wechsler, *The Federal Courts and the Federal System* 1262–65 (1973).

**25.** 8 U.S. (4 Cranch) 75, 93, 2 L.Ed. 554 (1807).

**26.** See note 22, *supra*, and discussion of *United States v. New York Telephone Co.*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), at p. 848, *infra; see also Davis v. United States*, 328 U.S. 582, 603–607, 616–618, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946) (Frankfurter, J., dissenting); *United States v. One Red Motor Truck*, 6 F.2d 412 (D.R.I.1925); Fraenkel, *Concerning Searches and Seizures*, 34 Harv.L.Rev. 361, 380 (1920).

Constitution, "must be given by the *written law*." Our understanding of the development of the common law and the Fourth Amendment and our understanding of the nature of federal law as settled in the early days of the Republic lead us to this conclusion.

## IV. THE INHERENT POWER OF LAW ENFORCEMENT AGENTS UNDER THE FOURTH AMENDMENT TO BREAK AND ENTER IN THE EXECUTION OF SEARCH WARRANTS

■ This brings us to the last issue in the case. Given the 1968 statute which permits eavesdropping, is it "reasonable" under the Fourth Amendment for officers to break and enter someone's house or office in order to execute an eavesdrop order? Do law enforcement agents have an independent or inherent authority sanctioned by the Fourth Amendment to break and enter to execute a search warrant, a power that may be extended by analogy to the execution of an eavesdropping warrant? We hold that they do not. To execute an otherwise valid search warrant by breaking into the suspect's house violates settled precedents as to what constitutes a "reasonable" search under the Fourth Amendment. In the absence of explicit statutory authorization, we are unwilling to create a wholly new exception to general search and seizure principles which have held for centuries that such conduct is illegal.

### A. The Authority to Break and Enter in the Execution of a Search Warrant at Common Law

The notion of what constitutes a "reasonable" search under the Fourth Amendment, while adaptable to the circumstance of each search, also has important historical content

and has traditionally been interpreted in light of common law standards of search and seizure at the time of the adoption of the Amendment.[27] As the Supreme Court said in 1925 in *Carroll v. United States*:

> The Fourth Amendment is to be construed in light of what was deemed a reasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens. 267 U.S. 132 at 149, 45 S.Ct. 280 at 284, 69 L.Ed. 543.

As a matter of history, it cannot seriously be contended that eighteenth century law permitted the King's officers to wait until a suspect's home or place of business was temporarily unattended in order to make a secret, forcible, nighttime entry to execute a search warrant. The search warrant was originally unknown at common law, and apparently the only way to recover stolen goods was to catch the thief in the act or sue him in a civil action in theft. The early common law recognized the need to return stolen goods and the need to prosecute thievery, but it did not see the need to provide a writ to search for stolen goods for use as evidence in a criminal prosecution. Gradually, as Lord Camden observed in *Entick v. Carrington,* a common law power to issue search warrants for stolen property grew out of the need to retake the goods and to arrest the thief.[28]

In the execution of such warrants, one influential jurist of the Seventeenth Century, Chief Justice Matthew Hale, in his *History of the Pleas of the Crown,* stated that officers, armed with a search warrant, might break down the door to execute the warrant, but only after first giving notice

---

**27.** *People v. Chiagles,* 237 N.Y. 193, 142 N.E. 583 (1923) (Cardozo, J.); Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 34–37 (1937); *Terry v. Ohio,* 392 U.S. 1, 17–18, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Gerstein v. Pugh,* 420 U.S. 103, 114–116 and 116 n. 17, 95 S.Ct. 854, 43 L.Ed.2d 54.

**28.** 19 Howell's State Trials at 1066–1067; 2 Pollack and Maitland *The History of English Law* 155–168, 177, 496–498, 616–617 (1895); Holmes, *The Common Law,* 165–166, 256 (1881); Ames, *The Disseisin of Chattels,* 3 Harv.L.Rev. 23, 24, 28–29 (1889); *United States v. Maresca,* 266 F. 713 (S.D.N.Y.1920); 2 Hale, *History of the Pleas of the Crown* 113, 149 (London, 1773).

and being refused admittance.[29] Except where authorized by statute, breaking and entering in other circumstances was prohibited, as were searches conducted at night.[30]

### B. The Argument that Eavesdrop Break-ins Come Within Principles Allowing Forcible Entry without Notice in Emergency Circumstances or Where a Building is Abandoned

This appears to be the general state of the law on forcible entry to execute a search warrant at the time the Fourth Amendment was adopted. Gradually, since that time, search warrants became more common as statutes multiplied the number of crimes for which such warrants could be issued. Federal and state courts gradually incorporated Hale's principles and applied them to the growing number of search warrant cases, permitting forcible entry in the execution of warrants only *after* the officer gives notice and is refused admittance.[31]

In addition, courts have permitted break-ins without prior notice and refusal in a limited set of so-called "exigent" or emergency circumstances, as in the case of the fleeing felon, the hostage and other life-endangering situations, and the threatened destruction of evidence.[32] In all of these situations, the person inside is *aware* of the presence and purpose of the officer. These situations, therefore, are not really excep-

tions to the requirement of notice and refusal before entry.[33] The doctrine of "exigent circumstances" is designed to give the officer on-the-spot discretion to make quick decisions to enter forcibly in emergencies where the occupants know of the officer's presence. It has no application to an entry for the purpose of installing an eavesdrop device, an entry planned in advance to take place when a home or office is unattended and the regular occupants are unaware of the officer's presence.[34]

Breaking and entering a vacant building to execute a search warrant is more analogous to a forcible entry under an eavesdropping warrant. The law permits such entries into abandoned, vacant buildings. But officers may not break into a building without first making reasonable efforts to find someone to unlock it,[35] nor should they deliberately delay execution of a warrant until the occupants have left and then break in under the pretense of entering a vacant building.[36]

Governmental searches and inspections of homes, offices, businesses, automobiles and luggage, in connection with the enforcement of health, safety, environmental, civil rights, tax and other laws and regulations are becoming a routine part of American life. Most of these inspections now take place openly *by consent* of the parties. It would be unreasonable—in the absence of a

**29.** 2 Hale, *supra,* at 151, but compare 114, 116.

**30.** *Ker v. California,* 374 U.S. 23, 54–58, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) and cases cited therein (Brennan, J., dissenting); *United States ex rel. Boyance v. Myers,* 398 F.2d 896, 897–898 (3rd Cir. 1968). See also Cooley, *Constitutional Limitations* 624–626 (8th ed. 1927); 1, *Chitty's Criminal Law* 52 (5th American ed. 1847) ("[I]n all cases where the law is silent, and express principles do not apply, this extreme violence [breaking the door] is illegal.").

**31.** *Bell v. Clapp,* 10 Johns. 263 (N.Y.Sup.Ct. 1813); *Chipman v. Bates,* 15 Vt. 51 (1843); *United States v. Agrusa,* 541 F.2d 690, 699–701 (8th Cir. 1976), *cert. denied* 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977); *Miller v. United States,* 357 U.S. 301, 306–310, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

**32.** *Miller v. United States, supra,* 357 U.S. at 309, 78 S.Ct. 1190; *Sabbath v. United States,* 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828

(1968); *Ker v. California, supra,* 347 U.S. at 40, 83 S.Ct. 1623.

**33.** *Ker v. California, supra,* 347 U.S. at 54–55, 83 S.Ct. 1623 (Brennan, J., dissenting).

**34.** See *Katz v. United States,* 389 U.S. 347, 357–358, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**35.** *United States v. Carriger,* 541 F.2d 545 (6th Cir. 1976); *United States v. Blank,* 251 F.Supp. 166, 173 (N.D.Ohio 1966). *See Blackmar v. Nickerson,* 188 Mass. 399, 74 N.E. 932 (1905) (unreasonable for officer to break into a locked safe in absence of owner rather than awaiting owner's return).

**36.** *United States v. Gervato,* 340 F.Supp. 454 (E.D.Pa.1972), rev'd 474 F.2d 40 (3rd Cir.), *cert. denied,* 414 U.S. 864, 94 S.Ct. 39, 38 L.Ed.2d 84 (1973).

statute carefully circumscribing and controlling the practice—for government agents and inspectors instead to adopt a policy of waiting to enter secretly by force until the place is temporarily unoccupied or unattended. It is just such a policy that the government asks us to approve in this case. In order to do so, we would have to create a broad new exception to the requirement of notice, an exception heretofore unknown to the common law and the Fourth Amendment.

## C. The Argument that Section 3109, Title 18, Allows Forcible Entry to Install Eavesdrops

To do so would also violate the spirit and reason of the only federal statute ever passed on the subject of forcible entry, Section 3109 of Title 18. It does not contemplate break-ins in the absence of notice to the occupants except in the case of an emergency:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the search warrant.

This statute, construed by the Supreme Court to be a codification of common law principles,[37] contemplates that officers will attempt to serve search warrants when occupants are present. Only a life-endangering situation or other perilous circumstances excuse officers from giving notice of their presence. Officers may forcibly enter an abandoned, unoccupied building or dwelling to execute a search warrant if the need arises, but they may not wait until the people who normally use or occupy a building are away so that they can break into it.

## D. The Argument that a New Exception Should Be Created to Allow Eavesdrop Break-ins Because the Fourth Amendment's Protection is Limited Only to Privacy

The government's argument that breaking and entering is a sensible (and therefore a "reasonable") means of executing an eavesdrop order focuses on language in *Katz* and other wiretapping opinions that the Fourth Amendment principally guards individual privacy; it "protects people, not places."[38] Thus, once police have obtained a warrant to invade a person's privacy through electronic eavesdropping, there are no "additional" Fourth Amendment rights which deserve independent Constitutional protection and therefore no "extra" reasons to prohibit police from breaking and entering to install the eavesdrop.

As we have already discussed in Part II of this opinion, the difficulty with this argument is that it is too narrow and misinterprets Supreme Court language intended to broaden the scope of the Fourth Amendment to include privacy in the form of confidential speech as well as physical intrusion. The government's argument attempts to limit the protection of the Fourth Amendment to confidential speech only.

The Fourth Amendment is more than a Constitutional right to privacy.[39] It also protects—just as it says in the text—"the right of the people to be secure in their persons, houses, papers, and effects" from the prospect of armed policemen climbing in unannounced at night through a bedroom window.[40]

The difference between the invasion of privacy by electronic eavesdropping and the threat to life and property caused by the secret, forcible entrance of a live policeman are not hard to appreciate. The policeman interferes with property which is private;

**37.** *Sabbath v. United States,* 391 U.S. 585, 588, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968).

**38.** 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**39.** *United States v. Chadwick,* 433 U.S. 1, 11 n. 6, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

**40.** *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."). See *Lasson, supra* note 27, at 51–78.

he may also interfere with people who wish to be private or their papers and effects; he may even shoot someone or be shot himself.[41] None of these concerns is directly related to private conversation. All fall within the Amendment's protection.

We fully appreciate the government's contention that Title III authorizes eavesdropping and, implicitly, the use of any reasonable procedures consistent with and limited to the search for incriminating conversation. If surreptitious breaking and entering infringed only conversational privacy and related interests, it would be an appropriate method of executing an eavesdrop order. But it is our view that these actions so aggravate the circumstances of the search and go so far beyond what is encompassed in the scope of the eavesdrop statute, that an eavesdrop executed in this manner is an unreasonable search.

## V. DISCUSSION OF THE OTHER FEDERAL APPELLATE CASES CONCERNING BREAK–INS UNDER THE 1968 EAVESDROP STATUTE

We do not interpret the Supreme Court decision last term in *United States v. New York Telephone Company*,[42] as contrary to our decision here. Rather, we believe it supports the distinctions we have drawn. In that case, the Supreme Court held: (a) the 1968 electronic surveillance statute does not implicitly provide federal judges with power to issue search warrants authorizing agents to install on telephone lines a "pen register," a device which records the numbers dialed on a telephone without monitoring the conversation; but (b) Rule 41(b) of the Federal Rules of Criminal Procedure, authorizing issuance of a warrant to

"search for . . . property that constitutes evidence of the commission of a criminal offense," does provide an independent statutory basis for a federal judge, upon a finding of probable cause, to issue a warrant permitting F.B.I. agents to install a pen register on a suspect's line.

Justice White's opinion for the Court in the *New York Telephone* case appears to agree with that part of Justice Stevens' dissenting opinion which argues that "the history and consistent interpretation of the federal court's power to issue search warrants conclusively show that [the power is not inherent, but] must await congressional deliberations" and *a specific grant* of legislative authority.[43] The two opinions simply disagree on the issue of whether Rule 41(b) provides federal judges with such a specific grant of power in the case of penregister search warrants.[44]

The Supreme Court therefore appears to be unanimous in the view that courts should not infer under the 1968 eavesdropping statute broad powers not expressly conferred, including, we think, the power to break and enter. The Court also appears to be unanimous in the view that the federal judicial power to issue a search warrant is not inherent but must be found in a specific grant of legislative authority. We believe the opinion, therefore, supports our decision that the judicial power to permit breaking and entering to install eavesdrops is not inherent but must be found in a specific grant of Congressional authority.

The Supreme Court has not yet ruled on the breaking and entering question decided here, but five circuits have now ruled on the question—the Second,[45] Third,[46]

---

**41.** As Mr. Justice Jackson wrote, concurring in *McDonald v. United States*, 335 U.S. 451, 460–461, 69 S.Ct. 191, 196, 93 L.Ed. 153 (1948):

Many homeowners in this crime-beset city doubtless are armed. When a woman see a strange man, in plain clothes, prying up her bedroom window and climbing in, her natural impulse would be to shoot. A plea of justifiable homicide might result awkwardly for enforcement officers. But an officer seeing a gun being drawn on him might shoot first.

**42.** 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977).

**43.** *Id.* at 179, 98 S.Ct. at 376.

**44.** *Id.* at 175 n. 23, 98 S.Ct. 364.

**45.** *United States v. Scafidi,* 564 F.2d 633 (1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978).

**46.** *United States v. Dalia,* 575 F.2d 1344 (1978), *cert. granted,* —— U.S. ——, 99 S.Ct. 78, 58 L.Ed.2d 108.

Fourth,[47] Eighth,[48] and District of Columbia[49] Circuits. These decisions are in conflict, and the theories advanced in support of the decisions vary widely. We recognize that our analysis in this opinion does not adopt or follow any one of the various theories of any of the other circuits. We will briefly describe the cases from the other circuits and explain the reasons we have analyzed the problem somewhat differently.

The Fourth and District of Columbia Circuits have adopted a "two-search" analysis which separates, for Fourth Amendment purposes, the actual interception and recording of words from any break-in which may be necessary in order to install bugging equipment. The District of Columbia Circuit carries this approach to its ultimate conclusion by requiring police to obtain two search warrants, one to seize the words and another to break-in to install a microphone, each warrant to be tested by traditional Fourth Amendment standards of probable cause, particularity and reasonableness. The first warrant is provided for by the wiretap statute; the D. C. Circuit finds no statutory authority for the second "warrant" but appears to hold, without full discussion of the issue, that judicial officers have inherent authority to issue a search warrant permitting forcible entry.

The Fourth Circuit, on the other hand, finds in the 1968 eavesdrop statute alone both the legislative authorization for police to break and enter and an implicit requirement that every such break-in be previewed and approved by the issuing judge. While the D. C. Circuit would apparently require a greater showing of need to justify a break-in than to justify a non-trespassory tap, the Fourth Circuit finds these standards synonymous.

The Eighth Circuit holds that while there are "two aspects" of a trespassory tap, "this difference is, for constitutional purposes, one of degree rather than kind."[50] The Court found that breaking and entering was not "unreasonable" under Fourth Amendment standards where it was approved beforehand by the issuing judge. The opinion noted that the determination of reasonableness would be "much more difficult" if the police had committed the break-in without prior court approval. The court en banc later denied, by a four to four vote, a petition for rehearing, the dissenters arguing that breaking and entering is inherently unreasonable and violates the Fourth Amendment without regard to prior approval by a federal judge.[51]

The Second and Third Circuits have gone further in permitting break-ins than other courts of appeals. They hold both that the wiretap statute implicitly authorizes any reasonable means of executing the warrant, including break-ins, and that police are not required to obtain prior judicial approval of the entry.

No court has yet held that it is reasonable under the Fourth Amendment for a law enforcement agent to install an eavesdrop by forcible entry in the absence of a finding of implicit statutory authority under the 1968 Act or specific judicial authority contained in a warrant. We do not find any opinions, therefore, which disagree with the conclusions reached in Section IV of this opinion.

For reasons explained in Section II, we are unable to find any language in the eavesdrop statute authorizing break-ins to install electronic devices, and we therefore disagree with the opinions of the Second, Third and Fourth Circuits and the three judge panel of the Eighth Circuit, all of which acknowledge that the statute is silent on the subject but are willing to read the power into the statute by implication. For reasons explained in Section III of our opin-

**47.** *Application of United States,* 563 F.2d 637 (1977).

**48.** *United States v. Agrusa,* 541 F.2d 690 (1976), *cert. denied,* 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977).

**49.** *United States v. Ford,* 180 U.S.App.D.C. 1, 553 F.2d 146 (1977).

**50.** 541 F.2d at 698.

**51.** 541 F.2d at 704.

ion and discussed in the Supreme Court opinions in the *New York Telephone* case, we disagree with the Fourth. and District of Columbia Circuits that federal judicial officers have inherent authority to authorize break-ins in the execution of search warrants.

We need not decide whether we agree with the four members of the Eighth Circuit *en banc* court who would hold that break-ins to install eavesdrop devices violate the Fourth Amendment under all circumstances, even if authorized by statute. We need not decide whether such a statute would be constitutional. We hold only that no statute, including the 1968 electronic surveillance statute and § 3109, presently authorizes such conduct, and that Article III of the Constitution and the reasonableness clause of the Fourth Amendment prevent federal judicial and law enforcement officers from authorizing or engaging in such conduct in the absence of statutory authority.

Accordingly, Judge Keith's order suppressing all evidence in this case obtained as a result of the illegal break-in is affirmed.

CELEBREZZE, Circuit Judge, concurring in the result.

I concur in the judgment of affirmance reached in Judge Merritt's opinion for the court but I do not concur in the reasoning employed therein.

I would follow the fourth circuit and hold that surreptitious entry to install electronic listening devices must be expressly approved in the court order authorizing the interception itself. *Application of the United States,* 563 F.2d 637 (4th Cir. 1977). *See also United States v. Agrusa,* 541 F.2d 690, 696 & n. 13 (8th Cir. 1976), *cert. den.* 429 U.S. 1045, 97 S.Ct. 751, 50 L.Ed.2d 759

(1977) (approving order with express approval of surreptitious entry and noting that the issue becomes "much more difficult" without such express authorization). I would not go so far, however, as the District of Columbia circuit apparently has in requiring two search warrants. *United States v. Ford,* 180 U.S.App.D.C. 1, 553 F.2d 146 (1977). I would instead join the fourth and eighth circuits in allowing both the seizure of the conversation and the entry to install the listening devices to be approved in one court order. Since the order in this cause did not expressly authorize surreptitious entry, I concur in the result affirming the district court's suppression order.

Although authorization for surreptitious entry is arguably implicit in a court order permitting installation of a listening device in a private office (*see United States v. Scafidi,* 564 F.2d 633 (2d Cir. 1977), *cert. den.* 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978); *United States v. Dalia,* 575 F.2d 1344 (3d Cir. 1978), *cert. granted,* —— U.S. ——, 99 S.Ct. 78, 58 L.Ed.2d 108), I believe that such intrusive governmental action should require express advance approval.[1] Searches are generally considered per se unreasonable unless expressly authorized in advance by a search warrant. No less should be required where an entry is a discrete part of a prolonged invasion of the subject's privacy.

I agree with Part III of Judge Merritt's opinion concluding that federal judges derive their power to issue search warrants exclusively from statutes and that any power to order surreptitious entry must similarly be derived from a statute. I strongly disagree, however, with Part II of Judge Merritt's opinion which concludes that Title III of the Omnibus Crime Control and Safe Streets Act of 1968 does not contain sufficient statutory authorization for surrepti-

---

1. I would further hold that surreptitious entry should be approved by the district court only upon a showing by the applicant that other less intrusive means of electronic eavesdropping have been or would be ineffective. This is consistent with 18 U.S.C. § 2518(1)(c)'s requirement that the applicant state "whether or not other investigative procedures have been

tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." This requirement is also supported by § 2518(2): "The judge may require the applicant to furnish additional testimony or documentary evidence in support of the application."

tious entry to install listening devices.[2] This is a strained and hypertechnical reading of the statute. It is significant that none of the other circuits addressing this issue have so interpreted the statute. Neither appellant has made such an argument to this court.

While it is correct to say that Title III does not explicitly empower federal judges to authorize surreptitious entry to install listening devices, it is unreasonable to require such explicit language. Title III clearly authorizes the interception of wire and oral communications under specified circumstances. 18 U.S.C. § 2510(4) defines "intercept" to mean "the aural acquisition of the contents of *any* wire or oral communication through the use of *any* electronic, mechanical or *other* device." (Emphasis added.) "*Any* electronic, mechanical or *other* device" necessarily includes those devices which must be installed inside the premises wherein the intercepted conversation is to occur. Since it would be self-defeating to require the consent of the owner of the premises and, as Judge Merritt's opinion concedes, "in some circumstances, the installation of an electronic bug may not be possible without a forcible breaking and entering of the suspect's premises," *ante* at 841, it follows that the statute contemplates that such devices can be installed surreptitiously.

Inferential support for authority to authorize surreptitious entry is also found in §§ 2518(1)(b)(ii), 2518(4)(b), and 2518(4) (last ¶). The first two provisions require the application and court order, respectively, to specify the "nature and location" of the place where the communication is to be intercepted. No limitations are placed on permissible locations. The third provision authorizes a court to *compel* assistance from a "communication common carrier, landlord, custodian or other person" in order to "accomplish the interception unobtrusively." The language of this provision apparently authorizes furtive placement of listening devices by gaining access to telephone lines, by using an apartment master key, or by other similar ploys. It is anomalous to hold that the statute does not authorize the entry involved in this case (through an unlocked window) when it plainly authorizes such an entry when facilitated by a landlord or custodian. Judge Merritt's opinion could make the result in a given case turn on the fortuity of whether one is an owner of his premises or a tenant or whether one employs custodians or not.

Moreover, I agree with the fourth circuit that the overall statutory scheme of Title III and its legislative history make clear that Title III authorizes district courts to approve surreptitious entry to plant listening devices. *Application of United States, supra,* 563 F.2d at 642–44. Judge Merritt's opinion notes some legislative history suggesting that Congress intended Title III to authorize such entry. *Ante,* at 839. I further agree with the fourth circuit that "any other conclusion would run counter to the principle that we should attempt to effectuate the purpose of federal legislation. . . . Cf. *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)." 563 F.2d at 642.

Finally, Judge Merritt's opinion is wholly inconsistent with *United States v. New York Tel. Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). There the Supreme Court held that federal district courts have the power to order the installation of pen registers to record the numbers dialed on a telephone.[3] While finding that pen registers were outside the ambit of Title III, the Court held that Federal Rule of Criminal Procedure 41 empowered district courts to authorize the installation of pen registers

---

2. I do not address the conclusion of Part IV of Judge Merritt's opinion since I disagree with its underlying premise that Title III does not itself authorize surreptitious entry. I do note, however, that reliance on 18 U.S.C. § 3109 is questionable. *United States v. Agrusa, supra,* 541 F.2d at 699–701.

3. While the Supreme Court's holding was contrary to my initial views on the topic, *Michigan Bell Tel. Co. v. United States,* 565 F.2d 385, 390 (6th Cir. 1977) (Celebrezze, J. dissenting), my views did not prevail and I am now bound by the Supreme Court's pronouncement.

and that the All Writs Act, 28 U.S.C. § 1651(a), empowered district courts to compel public utilities to cooperate in the installation of pen registers. The case is factually distinguishable from the instant case but it unmistakably stands for a broad reading of both Rule 41 and the All Writs Act in this general context. Therefore, given Title III's clear authorization of interception of communications, I believe the federal district courts gain sufficient ancillary power from Rule 41 and the All Writs Act to order surreptitious entry to implement such interceptions wholly apart from the power to authorize such entry which exists in Title III itself.

I would hold that district courts have power to authorize surreptitious entry to install listening devices pursuant to Title III but that such an entry must be expressly approved in advance by court order. Since there was no such express advance approval here, I concur in the judgment of affirmance.